520 F.2d 913
 UNITED STATES of America, Plaintiff-Appellee,
v.
Stanley MARKS, d/b/a Cinema X Theatre, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
AMERICAN AMUSEMENT COMPANY, INC., Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Guy WEIR, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Harry MOHNEY, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
AMERICAN NEWS COMPANY, INC., a/k/a American News
Distributing Co.,Defendant-Appellant.
 Nos. 74-1531 to 74-1535.
 United States Court of Appeals,
Sixth Circuit.
 July 30, 1975.
 
 Andrew B. Dennison, Brown, Dennison & Klayman, Cincinnati, Ohio, for marks.
 Eugene E. Siler, Jr., U. S. Atty., Louis DeFalaise, Sp. Asst. U. S. Atty., Lexington, Ky., for U. S. in all cases.
 Robert Eugene Smith, Gilbert H. Deitch, Atlanta, Ga., for Mohney, Weir and American Amusement Co., Inc.
 Theodore G. Albert, Ironwood, Mich., for American News Co., Inc.
 Before WEICK, McCREE and ENGEL, Circuit Judges.
 WEICK, Circuit Judge.
 
 
 1
 The defendants were charged in a nine-count indictment with eight substantive offenses of transporting in interstate commerce from various states to Newport, Kentucky, copies of obscene, lewd, lascivious and filthy films and film previews for the purpose of sale and distribution, in violation of 18 U.S.C. § 1465, and in the ninth count with a conspiracy in violation of 18 U.S.C. § 371.
 
 
 2
 All of the defendants were acquitted by the jury of the charge contained in Count 8 of the indictment, which count involved the film preview "Let Me Count the Lays." American News Company, Inc. was convicted only on the conspiracy Count 9. The remaining defendants were convicted on Counts 1 through 7 and Count 9. The individual defendants were each given concurrent sentences of three months' imprisonment and fined $2,000. American News was fined $5,000, and American Amusement was fined $7,000.
 
 
 3
 Each alleged obscene film or film preview was made the subject of a separate count in the indictment. The films involved in Counts 1 through 7 of the indictment were "Deep Throat" and "Swing High". The film previews were "Doctor's Disciples," "Teenage Cowgirls," "Black On White," "Memoirs of a Madam," and "A Few Bucks More."
 
 
 4
 The films had been viewed at Cinema X Theatre in Newport, Kentucky, by Special Agent Glossup of the FBI, another agent, and an Assistant United States Attorney, who paid for their admissions to the theatre. A few days later Special Agent Aebly viewed the film "Swing High" and the film preview "Doctor's Disciples" at the theatre.
 
 
 5
 Special Agent Glossup had made an investigation and learned that Cinema X was regularly receiving shipments in interstate commerce and had received interstate shipments shortly prior to the showing of the films and previews at the theatre. He also found out that the film "Deep Throat" had been made outside of Kentucky.
 
 
 6
 Special Agents Glossup and Aebly then executed separate Affidavits for a Search Warrant, to search the premises of Cinema X Theatre in Newport. The affidavit of Special Agent Glossup set forth in great detail the facts as to what each film or film preview depicted and exhibited, and also the narration.[1]
 
 
 7
 The affidavit of Glossup also stated that the films had been transported in interstate commerce.
 
 
 8
 The affidavit of Special Agent Aebly referred to Glossup's "companion" affidavit and stated that the films which he viewed were a violation of 18 U.S.C. § 1465 and provided an objective narrative of "Swing High" and "Doctor's Disciples."
 
 
 9
 The Government applied to a United States Magistrate for a search warrant based on the two affidavits and requested that the Magistrate set the time for a hearing on the issue of obscenity vel non. The Government also applied to the District Court for a temporary restraining order to prevent the removal or destruction of the films pending the obscenity hearing before the Magistrate, which application was granted. Copies of the restraining order and notice of hearing before the Magistrate were served on the individual then in charge of Cinema X.
 
 
 10
 A motion to dismiss was filed by appellant, Stanley Marks, doing business as Cinema X Theatre, and it was denied by the District Judge.
 
 
 11
 The Magistrate conducted a hearing on the issue of obscenity. Special Agents Glossup and Aebly testified and were cross-examined and their affidavits were admitted in evidence. Near the conclusion of the hearing Mr. Marks asked for a continuance to present expert testimony on the issue of obscenity, which request was denied, and the search warrant was issued. The record does not reveal any effort by the appellant Marks to present the films to the Magistrate to aid him in making his determination of obscenity.
 
 
 12
 A search of the premises of Cinema X Theatre was conducted. The films and film previews which are the subjects of the indictment were seized along with advertising displays and time schedules.
 
 
 13
 A motion to suppress was made and was denied.
 
 
 14
 * In our opinion there was probable cause for the Magistrate to issue the search warrant. The action of the Magistrate in issuing the search warrant was supported by the affidavits of Special Agents Glossup and Aebly. These affidavits clearly indicated that the films involved hard core pornography of the worst sort.
 
 
 15
 The showing of the film was not protected by the First Amendment. It was not required that the Magistrate view the films. He could accept the sworn statements of the two Special Agents which graphically portrayed the films as well as the sound features. The Special Agents were also examined and cross-examined at the hearing.
 
 
 16
 If Mr. Marks desired to offer expert testimony on the obscenity issue he should have presented his witnesses at the hearing and not asked for a continuance, which the Magistrate was not bound to grant. We find no abuse of discretion on the part of the Magistrate.
 
 
 17
 Nor do we find any error on the part of the District Court in granting a temporary restraining order without notice to appellants, which injunction was granted for the sole purpose of preventing the destruction or removal of the films and thereby preserving the status quo. United States v. Little Beaver Theatre, Inc., 324 F.Supp. 120 (S.D.Fla.1971).
 
 
 18
 The affidavit of Agent Glossup also was sufficient to establish that the films had been transported in interstate commerce.
 
 
 19
 The District Court was correct in denying the motion to suppress.
 
 II
 
 20
 In our opinion the provisions of 18 U.S.C. § 1465 are not vague nor overbroad. The statute is constitutional. Miller v. California, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973); United States v. 12 200-ft. Reels of Super 8MM Film, 413 U.S. 123, 93 S.Ct. 2665, 37 L.Ed.2d 500 (1973); Smith v. United States, 505 F.2d 824 (6th Cir. 1974); United States v. Hill, 500 F.2d 733 (5th Cir. 1974); United States v. Manarite, 448 F.2d 583 (2d Cir. 1971), cert. denied, 404 U.S. 947, 92 S.Ct. 281, 30 L.Ed.2d 264 (1971).
 
 III
 
 21
 In arguing that there was no proof of conspiracy, the appellants assert that it was necessary to prove that they had actual knowledge that the films were obscene under the law. We disagree.
 
 
 22
 The scienter required to support their conviction, however, was not that they actually knew that the films were obscene under legal standards, but only that they knew the general nature and character of the films. Rosen v. United States, 161 U.S. 29, 41, 42, 16 S.Ct. 434, 40 L.Ed. 606 (1896). This was made explicit in United States v. Hamling, 481 F.2d 307 (9th Cir. 1973), aff'd, 418 U.S. 87, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974); United States v. Mishkin, 317 F.2d 634, 637 (2d Cir. 1963), cert. denied, 375 U.S. 827, 84 S.Ct. 71, 11 L.Ed.2d 60 (1963).
 
 
 23
 It was not necessary that the films be judicially determined to be obscene before any conspiracy to violate Section 1465 could exist.
 
 
 24
 In our opinion there was substantial evidence to support the conviction of the appellants on the conspiracy count.
 
 IV
 
 25
 The use of a multi-count indictment was not unconstitutional and no case cited by appellants so holds. Each count of the indictment charges a separate and distinct offense. The criteria to establish each offense is different.
 
 
 26
 What appellants are really complaining about is that the proof did not show that each film or film preview was shipped in interstate commerce on a day certain. The indictment alleged that "Deep Throat" was shipped between the dates of January 24 and January 31, 1973; that "Swing High" was shipped between February 1 and February 27, 1973; that the remaining shipments were made between January 15 and February 27, 1973. The exact dates of these shipments could not very well be proven by the Government because Cinema X had destroyed its records of the shipments.
 
 
 27
 In our opinion the transportation of each film or film preview constituted a separate offense. United States v. Bennett, 383 F.2d 398 (6th Cir. 1967). See also Sanders v. United States, 441 F.2d 412 (10th Cir. 1971).
 
 
 28
 The proof established that Cinema X was receiving shipments from different states.
 
 
 29
 There was some evidence that "Deep Throat" was filmed in New York and Florida.
 
 
 30
 The conspiracy would also constitute an offense separate from the substantive offenses.
 
 
 31
 In any event, there could be no prejudice to the appellants because the sentences on all the counts were made concurrent.
 
 V
 
 32
 The District Court did not err in denying the motion of the defendants to voir dire the jury to determine whether they heard all of the film dialogue of "Deep Throat" shown in the courtroom.
 
 
 33
 Their first motion was addressed to whether the jury could hear and "understand" the dialogue, but later defendants dropped the "understand" part.
 
 The District Court said:
 
 34
 THE COURT: Very well. I overrule your motion. I heard the dialogue, I saw the picture. I can't say I understood the dialogue in its greatest detail, but I understood it well enough to get the sense of the picture as these experts, all of them the defendant's, outlined it. (Tr. 643)
 
 The Court further stated:
 
 35
 THE COURT: Well now, I think to ask them if they understood
 
 
 36
 MR. DENNISON: That is could they hear it.
 
 
 37
 THE COURT: and heard the complete dialogue is an extreme situation. I'm not sure there is any trial in any case that the jury has to go on record as saying, "I understand completely everything that has gone on in this case."
 
 
 38
 MR. DENNISON: No, Your Honor, I didn't mean to confuse the Court by the term "understand". Rather what I meant to say, if I did use the term "understand" was that they could hear it, was it audible to them.
 
 
 39
 THE COURT: Well, I'll have to exercise my own conclusions as to if it was addressing itself to the jury as it did to me and I could see it, hear it, and understand it and I must assume that the jury could. I'm not saying it was the most perfect showing, not the same as you would get on a large screen, or that the accoustics in this courtroom are the same as they are in a theater, but I think it was sufficient to understand it. In addition to that it was explained in detail by the expert witnesses. I think the jury has had ample disclosure of the film's plot, its purpose, and I will overrule your motion. (Tr. 644-645)
 
 
 40
 It appears from the foregoing that the District Judge was able to see, hear, as well as understand the "Deep Throat" dialogue. In addition, the dialogue was discussed in the testimony of the defendants' experts, so that the jury knew all about it.
 
 
 41
 It was not contended that the jurors did not get a good view of the pictures shown on the film which portrayed obscenity at its worst.
 
 
 42
 Nor did the defendants point out what portions, if any, of the sound track of the film were inaudible, or offer to provide one of their better films.
 
 
 43
 No issue was raised as to the viewing of the film previews.
 
 
 44
 This issue was addressed to the sound discretion of the District Court which saw the film and heard the dialogue.
 
 
 45
 We find no abuse of discretion.
 
 VI
 
 46
 Appellants contend that they were deprived of their right to a fair trial and due process rights when the District Judge instructed the jury that the contemporary community standards would be comprised of the Eastern District of Kentucky, as opposed to the national standard, or even the Cincinnati-Covington area. Appellants assert that "community" should not have been defined by the precise political-geographic boundary of the Eastern District of Kentucky. We disagree.
 
 
 47
 The jury was composed entirely of residents of the Eastern District of Kentucky. The Cinema X Theatre was located in Newport, Kentucky, a city within the Eastern District. In addition, the District Judge permitted testimony with respect to the community standards of the Cincinnati area, although Cincinnati is in a different state.
 
 
 48
 In Miller v. California, supra, 413 U.S. at 33-34, 93 S.Ct. 2607, the entire state of California was found a proper focal point for determining community standards.
 
 
 49
 In Hamling v. United States, 418 U.S. 87, 94 S.Ct. 2887, 41 L.Ed.2d 590 (decided June 24, 1974), the Supreme Court defined a "community" for federal obscenity cases as follows:
 
 
 50
 Since this case was tried in the Southern District of California, and presumably jurors from throughout that judicial district were available to serve on the panel which tried petitioners, it would be the standards of that "community" upon which the jurors would draw. But this is not to say that a District Court would not be at liberty to admit evidence of standards existing in some place outside of this particular district, if it felt such evidence would assist the jury . . . . (Id. at 105, 94 S.Ct. at 2901)
 
 
 51
 See Jenkins v. Georgia, 418 U.S. 153, 94 S.Ct. 2750, 41 L.Ed.2d 642 (1974).
 
 
 52
 We conclude that the District Judge could properly limit the community standard to the area encompassed by the Eastern District of Kentucky.
 
 VII
 
 53
 Finally, it is contended that the District Court erred in its instructions to the jury by applying the standards in the most recent decisions of the Supreme Court in Miller v. California, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973), and companion cases.[2]
 
 
 54
 Appellants assert that since the offenses of which they were convicted were committed prior to the Miller and companion decisions, they were entitled to the protection of the Roth-Memoirs definition of obscenity. Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957); Memoirs v. Massachusetts, 383 U.S. 413, 86 S.Ct. 975, 16 L.Ed.2d 1 (1966). They contend that the Miller formulation as to obscenity as applied to their pre-Miller offenses constituted an ex post facto law and violated their constitutional rights to due process of law and a fair trial.
 
 
 55
 Roth held specifically that obscene material is not protected by the First Amendment. Id. 354 U.S. 485, 77 S.Ct. 1304. This was also the theme of Miller and companion cases.
 
 
 56
 The Roth-Memoirs formulation provided that in order to be obscene,
 
 
 57
 (a) The dominant theme of the material taken as a whole appeals to a prurient interest in sex;
 
 
 58
 (b) The material is patently offensive because it affronts contemporary community standards relating to the description or representation of sexual matters;
 
 
 59
 (c) The material is utterly without redeeming social value.
 
 
 60
 The Miller formula changed only (c) in the Roth-Memoirs definition so that it would read as follows:
 
 
 61
 (c) Whether the work taken as a whole lacks serious literary, artistic, political or scientific value.
 
 
 62
 Chief Justice Burger, who wrote the opinion for the majority in Miller, stated the reasons for the change in the definition. In the first place, the Roth-Memoirs definition (c) had never been approved by a plurality of more than three Justices at any one time. It imposed a burden virtually impossible to discharge under our criminal standards of proof.
 
 
 63
 Mr. Justice Harlan, in his dissent in Memoirs, wondered whether formulation (c) had any meaning at all. Id., 383 U.S. 459, 86 S.Ct. 975.
 
 
 64
 It is plain to us that the material in the present case was obscene, irrespective of which standards are applied.
 
 
 65
 Examples of obscene matter were given in Miller:
 
 
 66
 (a) Patently offensive representations or descriptions of ultimate sexual acts, normal or perverted, actual or simulated.
 
 
 67
 (b) Patently offensive representations or descriptions of masturbation, excretory functions, and lewd exhibition of the genitals. (Id., 413 U.S. 25, 93 S.Ct. 2615)
 
 
 68
 The brochures found to be obscene in Miller "consist of pictures and drawings very explicitly depicting men and women in groups of two or more engaging in a variety of sexual activities, with genitals, often prominently displayed." (Id. 18, 93 S.Ct. 2612)
 
 Appellants assert
 
 69
 . . . (P)rior to Miller only a modicum of social value need be shown for a film to be non-obscene.[3]
 
 
 70
 We disagree.
 
 
 71
 "Modicum" is defined in Webster's New American Dictionary of the American Language, College Edition, as "a small amount in portion, bit."
 
 
 72
 If this were the law then an obscene film could be insulated and made nonobscene by a narrative which quoted only a single sentence from the Bible.
 
 
 73
 Under the Roth-Memoirs standard it was always necessary for the Government to prove that the dominant theme (not modicum ) appealed to the prurient interest in sex in order to be obscene.
 
 
 74
 As well stated by Chief Justice Warren, in his concurring opinion in Roth, 354 U.S. at 496, 77 S.Ct. at 1315:
 
 
 75
 They were plainly engaged in the commercial exploitation of the morbid and shameful craving for materials with prurient effect. . . . That is all that these cases present to us, and that is all we need to decide.
 
 
 76
 Libelous material does not become nonlibelous merely because it is accompanied by a modicum of nonlibelous matter.
 
 
 77
 The defendants were entitled to any benefit they could derive from Miller and companion cases. Hamling v. United States, supra; Jenkins v. Georgia, supra.
 
 
 78
 There can be no question but that the material in "Deep Throat" was hard core pornography. It was the type referred to by Mr. Justice Stewart in Jacobellis v. Ohio, 378 U.S. 184, at 197, 84 S.Ct. 1676, at 1683, 12 L.Ed.2d 793 (1964), when he stated we "know it when (we) see it." The jury saw it when it reviewed the film and had no difficulty in assessing its character.
 
 
 79
 The case was tried before one of our ablest District Judges, the late Mac Swinford, who applied the Miller formulation. We believe he was required to do so by the specific terms of the remand in Miller, which was "for further proceedings not inconsistent with First Amendment standards as established by this opinion. See United States v. 12 200-Ft. Reels of Film, post (413 U.S.) 130 n. 7 (93 S.Ct. 2665.)" Note 7 reads:
 
 
 80
 . . . We are prepared to construe such terms as limiting regulated material to patently offensive representations or descriptions of "hard core" sexual conduct given as examples in Miller v. California, supra (413 U.S.) at 25 (93 S.Ct. 2607). See United States v. 37 Photographs, supra (402 U.S. (363)) at 369-374 (91 S.Ct. (1400) at 1404-1407, 28 L.Ed.2d 822) (White, J.)
 
 
 81
 In United States v. 12 200-Ft. Reels of Super 8MM Film, 413 U.S. 123, 93 S.Ct. 2665, 37 L.Ed.2d 500 (1973), decided with Miller, the Court said:We have today arrived at standards for testing the constitutionality of state legislation regulating obscenity. See Miller v. California, supra (413 U.S.) at 23-25, 93 S.Ct. (2607), at 2614-2615. These standards are applicable to federal legislation. Id., at 129-130, 93 S.Ct. at 2671.
 
 
 82
 This issue, we think, is governed by the decision of the Supreme Court in Hamling v. United States, supra. In that case the District Court, pre-Miller, instructed the jury that the case was governed by the national standards for obscenity. On appeal, appellants contended that they were entitled to the benefit of Miller, namely that contemporary community standards should have been applied. In Hamling the Court held, 418 U.S. at 108, 94 S.Ct. at 2903:
 
 
 83
 . . . (W)e hold that reversal is required only where there is a probability that the excision of the references to the "country as a whole" in the instruction dealing with community standards would have materially affected the deliberations of the jury. (Citing authority) . . . Our examination of the record convinces us that such a probability does not exist in this case.
 
 
 84
 Our examination of the record in the present appeals convinces us that such a probability does not exist here, for it is clear that under either Roth-Memoirs or Miller standards the material was obscene.
 
 
 85
 The Court further stated in Hamling at 115, 94 S.Ct. at 2906:
 
 
 86
 Nor do we find merit in petitioners' contention that cases such as Bouie v. City of Columbia, 378 U.S. 347, 84 S.Ct. 1697, 12 L.Ed.2d 894 (1964), require reversal of their convictions. The Court in Bouie held that since the crime for which the petitioners there stood convicted was "not enumerated in the statute" at the time of their conduct, their conviction could not be sustained. Id., at 363, 84 S.Ct. (1697), at 1707. The Court noted that "a deprivation of the right of fair warning can result not only from vague statutory language but also from an unforeseeable and retroactive judicial expansion of narrow and precise statutory language." 378 U.S. at 352, 84 S.Ct. (1697), at 1702. But the enumeration of specific categories of material in Miller which might be found obscene did not purport to make criminal, for the purpose of 18 U.S.C. § 1461, conduct which had not previously been thought criminal. That requirement instead added a "clarifying gloss" to the prior construction and therefore made the meaning of the federal statute involved here "more definite" in its application to federal obscenity prosecutions. Bouie v. City of Columbia, 378 U.S. at 353, 84 S.Ct. (1697), at 1702. Judged by both the judicial construction of § 1461 prior to Miller, and by the construction of that section which we adopt today in the light of Miller, petitioners' claims of vagueness and lack of fair notice as to the proscription of the material which they were distributing must fail.
 
 
 87
 Defendants rely on United States v. Palladino, 490 F.2d 499 (1st Cir. 1974). The judgment in the first appeal in Palladino had been vacated and remanded by the Supreme Court to the Court of Appeals for consideration in the light of Miller and companion cases.
 
 
 88
 On the remand a divided Court of Appeals held that national and obscenity standards under Roth-Memoirs were to be applied rather than the community and obscenity standards under Miller. Senior Circuit Judge Bailey Aldrich dissented, stating in part:
 
 
 89
 I am not happy about the court's opinion. In the first place, the Court majority in Miller evinced no compunction about convicting Miller by a definition of obscenity that was not in effect at the time of his publication. Having in mind the mass of uncertainties in this field, see my prior dissent, I can see why the Court felt that the First Amendment did not bar an adverse change in the rules. If not for Miller, why for Palladino? This case does not fit the normal situation where the courts have had to determine whether constitutional principles are to be applied retroactively. With all respect, I do not find the Fifth Circuit's decision in United States v. Thevis (484 F.2d 1149) persuasive. The Court sent this case back to determine "in light of Miller, . . ." *
 
 
 90
 and I would apply the Miller definition, not Roth's or Memoirs'.
 
 
 91
 By the same token, we are not required by past decisions to give the defendant the benefit of national standards. Today, as a modest observer, I believe that national standards is a many-headed hydra, only ingenuously to be spoken of as within the competence of any expert short of Hercules, and beyond the mastery of any juror.
 
 
 92
 We agree with Judge Aldrich's dissent. We note that in Hamling, supra, Palladino was rejected by the Supreme Court in its holding that national rather than community standards should be applied.
 
 
 93
 In United States v. Wasserman, 504 F.2d 1012 (5th Cir. 1974), the Court reversed because Miller standards were applied, citing Palladino, its previous decision in United States v. Thevis, 484 F.2d 1149 (5th Cir. 1973), cert. denied 418 U.S. 932, 94 S.Ct. 3222, 41 L.Ed.2d 1170 (1974), and United States v. Jacobs, 513 F.2d 564 (9th Cir. 1974) as authority. Jacobs cited the Fifth Circuit decision in Thevis.
 
 
 94
 Thevis was pending on appeal when Miller and companion cases were decided. The Court of Appeals considered obscene standards under both Memoirs and Miller, and held that any count of the indictment based on a magazine which is not obscene under both standards would be dismissed. We do not regard Thevis as applicable.
 
 
 95
 We decline to follow Wasserman and Jacobs for the same reason that we do not follow Palladino. The time for filing in the Supreme Court petitions for certiorari, has not expired in either of these two cases.
 
 
 96
 We are of the opinion that under either Memoirs or Miller standards the films in the present appeals were obscene.
 
 
 97
 In our opinion the verdicts of the jury were supported by substantial evidence, and no prejudicial error intervened at the trial.
 
 
 98
 Affirmed.
 
 
 99
 McCREE, Circuit Judge (dissenting).
 
 
 100
 I respectfully dissent. Appellants contend that their convictions under 18 U.S.C. §§ 371, 1465 should be reversed because the district judge erroneously gave a Miller instruction. They contend that the issue whether the films are obscene should have been decided under the Roth-Memoirs standard because the films were seized before the Supreme Court decided Miller v. California, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973). Three circuits have considered the same issue and have determined that Miller expanded the field of potential criminal liability and that it would be unfair to hold defendants' conduct criminal by a retroactive application of Miller. See United States v. Jacobs, 513 F.2d 564 (9th Cir. 1974), United States v. Sherpix, 512 F.2d 1361 (D.C.Cir. 1975) (cases holding that Miller instruction for pre-Miller conduct was a denial of due process), and United States v. Wasserman, 504 F.2d 1012 (5th Cir. 1974) (retroactive application of Miller is inappropriate without substantial justification outweighing ex post facto considerations).
 
 
 101
 The majority opinion holds that the films in question are obscene under either the Roth-Memoirs formula or the Miller formula and it accordingly does not reach the issue whether Miller is an appropriate standard. If the jury had been given both the Miller and the Roth-Memoirs instructions, we could view the films and determine whether the jury's verdict that they were obscene was permissible. Jenkins v. Georgia, 418 U.S. 153, 94 S.Ct. 2750, 41 L.Ed.2d 642 (1974). However, since the jury was not given the Roth-Memoirs instruction ("utterly without redeeming social value"), to speculate on our view[1] of the films how the jury might have decided the case if it had been given the proper instructions would deny the right of trial by jury. I agree with the opinions rendered by unanimous panels in the District of Columbia, the Fifth, and the Ninth Circuits holding the retroactive application of Miller to be improper. I would reverse the convictions.
 
 
 
 [1]
 A composite of all of the films and film previews depict acts of cunnilingus, fellatio, onanism, sodomy, male ejaculation, sexual intercourse and group sex
 Deep Throat: portrayed a young female in quest of sexual fulfillment, which had eluded her because her clitoris was lodged in her throat. Scenes depicted males and females engaged in cunnilingus, sodomy, group sexual encounters where sodomy and fellatio were simultaneously practiced, sexual intercourse, and male ejaculation.
 Swing High: depicted a group sexual encounter where cunnilingus, fellatio, sexual intercourse, masturbation, onanism, and sodomy were practiced.
 Previews
 Doctor's Disciples: depicted acts of onanism, sexual intercourse, and male ejaculation.
 Teenage Cowgirls: two very young females are shown in close up scenes of fellatio and sexual intercourse.
 Black on White: depicted various acts of fellatio, cunnilingus and sexual intercourse by a white male with a black female and a black male with a white female.
 Memoirs of a Madam: portrayed three couples on a bed in various stages of nudity engaging in oral and genital acts, and with one female masturbating with a vibrator. This preview also depicted a black male and white female engaged in sexual intercourse.
 A Few Bucks More: portrayed fellatio, and male ejaculation.
 
 
 [2]
 Miller v. California, 1973, 413 U.S. 15, 27, 93 S.Ct. 2607, 2616, 37 L.Ed.2d 419, 432; Paris Adult Theatre I v. Slaton, 1973, 413 U.S. 49, 93 S.Ct. 2628, 37 L.Ed.2d 446; United States v. Orito, 1973, 413 U.S. 139, 93 S.Ct. 2674, 37 L.Ed.2d 513; Kaplan v. California, 1973, 413 U.S. 115, 93 S.Ct. 2680, 37 L.Ed.2d 492; United States v. 12 200-Ft. Reels of Super 8 mm Films, 1973, 413 U.S. 123, 93 S.Ct. 2665, 37 L.Ed.2d 500
 
 
 [3]
 Chief Justice Burger, in Miller, was of the view that it was easier to apply the relaxed standards in Miller, rather than the more stringent standards of Roth-Memoirs
 
 
 *
 The Fifth Circuit's First Amendment ruling was a bare assertion, and got off, I suggest, somewhat on the wrong foot by misquoting the mandate as remanding for further proceedings "not inconsistent with" Miller, etc., rather than "in light of." (490 F.2d at 504)
 
 
 [1]
 Although the challenged films were lodged with the court as exhibits, the majority of the panel decided that an examination of them was not necessary for decision. Accordingly, the films were not seen by any member of the panel