UNITED STATES of America, Plaintiff-Appellee,

v.

Stanley MARKS, Defendant-Appellant.

No. 77–5382.

United States Court of Appeals, Sixth Circuit.

Argued June 9, 1978.

Decided Oct. 5, 1978.

Arthur M. Schwartz, Denver, Colo., Robert E. Smith, Atlanta, Ga., Mott V. Plummer, Newport, Ky., for defendant-appellant.

Patrick H. Molloy, U. S. Atty., James E. Arehart, Asst. U. S. Atty., Lexington, Ky., for plaintiff-appellee.

Before WEICK, ENGEL and MERRITT, Circuit Judges.

ENGEL, Circuit Judge.

Stanley Marks appeals from a judgment entered upon a jury verdict finding him guilty on two counts of transporting obscene materials in interstate commerce and one count of conspiracy to commit that offense, in violation of 18 U.S.C. §§ 1465 and 371 (1976) respectively.[1]

Marks was earlier convicted on these same charges as well as additional counts of the substantive offense. *United States v. Marks*, 520 F.2d 913 (6th Cir. 1975). These convictions were reversed by the Supreme Court on the ground that the district court erred when, in charging the jury, it employed the definition of obscenity set out in *Miller v. California*, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973). That Court held that since the charged offenses occurred prior to *Miller*, Marks' conduct should have been measured by the standards of *Memoirs v. Massachusetts*, 383 U.S. 413, 86 S.Ct. 975, 16 L.Ed.2d 1 (1966), and *Roth v. United States*, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957). *Marks v. United States*, 430 U.S. 188, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977).

In a second trial, Marks was convicted of Counts I, II and IX of the indictment. Count I charged Marks, Henry Mohney, Guy Weir, and the American Amusement Company, Inc. with knowingly transporting an obscene film, "Deep Throat", from Michigan to Newport, Kentucky. Count II charged the same defendants with transporting an obscene film, "Swing High", also from Michigan to Newport. Count IX charged those same defendants and a fifth, American News Company, Inc., also known as American News Distributing Company,

---

1. 18 U.S.C. § 1465 (1976) states:

Whoever knowingly transports in interstate or foreign commerce for the purpose of sale or distribution any obscene, lewd, lascivious, or filthy book, pamphlet, picture, film, paper, letter, writing, print, silhouette, drawing, figure, image, cast, phonograph recording, electrical transcription or other article capable of producing sound or any other matter of indecent or immoral character, shall be fined not more than $5,000 or imprisoned not more than five years, or both.

The transportation as aforesaid of two or more copies of any publication or two or more of any article of the character described above, or a combined total of five such publications and articles, shall create a presumption that such publications or articles are intended for sale or distribution, but such presumption shall be rebuttable.

When any person is convicted of a violation of this Act, the court in its judgment of conviction may, in addition to the penalty prescribed, order the confiscation and disposal of such items described herein which were found in the possession or under the immediate control of such person at the time of his arrest.

18 U.S.C. § 371 (1976) states:

If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

If, however, the offense, the commission of which is the object of the conspiracy, is a misdemeanor only, the punishment for such conspiracy shall not exceed the maximum punishment provided for such misdemeanor.

with conspiring to transport obscene materials in interstate commerce.[2]

Viewed in the light most favorable to the government, the evidence showed that Marks' name appeared on the occupational license in the Cinema X Theatre in Newport, Kentucky, where the films were shown, on Newport tax records for that establishment, and on applications for telephone service made by American Amusement for Cinema X. American Amusement, located in Durand, Michigan, was wholly owned by codefendant Mohney and was a distributor of films to Cinema X and other members of a chain of theaters. On the aforementioned telephone applications Marks was listed as a partner of Mohney, and those two defendants along with Weir had been seen on one occasion together in Newport. Employees of Cinema X indicated that Marks generally performed supervisory functions at the theater.

The government also relied upon certain corporate documents of American Amusement, including "booking sheets" and "play date sheets", to show the normal shipping practices between Durand and Newport. There were no documents showing that "Deep Throat" and "Swing High" were actually shipped from Durand to Newport. There were, however, sheets indicating what movies were tentatively scheduled to play at Cinema X, although these apparently did not indicate the source of the movies. The testimony is uncertain concerning the exact exchange of documents between American Amusement and Cinema X, but apparently "booking sheets" were prepared by Marks or Weir who submitted them to American Amusement for confirmation. These sheets were requests for the particular films, and if the particular movie was unavailable another would be substituted. At the time of shipment, another document would be sent along with the movie giving instructions concerning where the film should be sent next. The documents contained the name American Amusement in a corner. Finally, of course, the seized films were introduced and shown to the jury.

On appeal Marks presents three issues. He argues that the admission into evidence of codefendant Weir's prior grand jury testimony violated his Sixth Amendment right of confrontation, relying on *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). Second, he contends that as a matter of law the films "Deep Throat" and "Swing High" are not obscene and are thus protected by the First Amendment. Third, he complains of improper comment by the prosecutor in his closing argument and urges that, absent the *Bruton* testimony, the evidence was not sufficient to convict him.

### I.

At trial the government read into evidence the prior recorded grand jury testimony of codefendant Guy Weir which concerned in general the authentication and explanation of certain documents belonging to American Amusement. Marks' attorney adequately preserved an objection to the introduction of this evidence on the basis of the defendant's right to confront and cross-examine the witnesses against him. The attorney also moved for a mistrial following introduction of the evidence. The motions were denied and no limiting instructions were given before or during the reading of the transcript. However, during the general charge at the conclusion of the trial, the court instructed the jury that Weir's testimony was admissible only as to him.

Marks argues that Weir's grand jury testimony directly incriminated him because it identified him as the owner of Cinema X and as the person who did the "booking" for Cinema X. Weir's grand jury testimony was read to the jury by former Assistant United States Attorney Louis DeFalaise, who had conducted the examination of Weir before the grand jury:

"QUESTION: Now, the item we refer to has been marked as Exhibit One, indi-

---

**2.** Counts III through VII were dismissed on a motion for judgment of acquittal because the evidence was insufficient to prove interstate transportation. In the first trial, all defendants were acquitted on Count VIII.

cates that the movie entitled 'Girl Friday' plus 'Throat' was being shown at Cinema X Theatre in Newport, Kentucky, from February 14th of 1973 to February 20th of 1973; is that correct?

"ANSWER: To the best of my knowledge. I can't—these here being down there didn't necessarily mean that those particular films were shown.

"QUESTION: Right.

"ANSWER: At that time or any other time; it's a tentative schedule.

"QUESTION: Right. This document, Exhibit One, also reflects February the 2nd, 1973, to the 20th, 1973, of February of 1973, 'Swing High' and 'Deep Throat' followed February 26th to March 6th, 'Sexual—'

"ANSWER: 'Therapist', I believe.

"QUESTION: 'Therapist', plus 'Coming Through the Window', question marks, week of March 7th to the 13th to the 14th to the 20th, 21st to the 27th of March of 1973, 'Girl Friday', 28th to April 3rd, 'Wise Husbands', plus 'Bare Country'. Now, does this sheet, then, indicate that you, in fact, were distributing the movie 'Deep Throat', to the Cinema X Theatre?

"ANSWER: Distributing?

"QUESTION: Well, having some connection with the fact that it was showing at Cinema X Theatre.

"ANSWER: Well, being the schedule on there, yes.

"QUESTION: All right.

"ANSWER: As far as the—

"QUESTION: The second sheet, the second sheet of this exhibit that you have produced as Government Exhibit One, or Grand Jury Exhibit One, shows that 'Deep Throat' was also playing from January 24th through February 13th. I assume that is the first sheet, and the other sheet that I mentioned was the second sheet?

"ANSWER: Mm-hum.

"QUESTION: Who prepares these sheets?"

(objections omitted)

"ANSWER: Well, Stanley Marks does the booking for the Cinema X.

"QUESTION: I see.

"ANSWER: In Newport.

"QUESTION: But, then, you actually supply the film from American Amusement Company?

"ANSWER: Not all the time we don't, no.

"QUESTION: Well, how would it happen that you would have this sheet in your possession?

"ANSWER: He submits this to us, because the daily report forms go in there.

"QUESTION: I see. Why would Mr. Marks submit such report sheets to you?

"ANSWER: Just to verify what he has booked—

"QUESTION: I see.

"ANSWER: —for his theatre.

"QUESTION: I see. Are we to assume from that, then, that Mr. Marks must report to the American Amusement Company what he's booked in the theatre?

"ANSWER: This I don't know as he must, but he does.

.     .     .     .     .

"A GRAND JUROR: I want to get straightened out on booking sheets. Did you testify that Stanley Marks did all the booking for Cinema X, am I correct?

"THE WITNESS: He does the booking for Cinema X.

"A GRAND JUROR: Is there a difference between booking and scheduling, or is the term synonymous?

"THE WITNESS: Well, yes, there is a booking they may request, and they may not be available, so something may have to be supplemented in that case to take its place. . . ."

Marks argues that the foregoing testimony was crucial to his conviction because no other evidence linked him to the operation of the theater and because it was especially material to the interstate commerce element and his knowledge of the general nature of the films.

The government's response is that the statement was not clearly incriminating at all and thus *Bruton* should not apply. It contends that any possible objection was waived by counsel's failure to request a severance of trials or a redaction of Marks' name from the transcript. Finally it states that the statements as to Marks were insignificant in relation to abundant other evidence of his guilt and thus any error was harmless.

We hold that *Bruton v. United States, supra,* applies. In *Bruton* testimony was introduced at a joint trial concerning oral confessions made by codefendant Evans after his arrest, admitting that he and defendant Bruton had committed the armed robbery offense. Evans did not take the stand and thus his out-of-court statement was not subject to cross-examination. The Supreme Court held that Bruton had been denied his right of confrontation under the Sixth Amendment because the jury instructions limiting the use of Evans' testimony were not an adequate substitute for Bruton's right of cross-examination.

█ A. The government argues that Weir's testimony is not the type of out-of-court declaration which poses the dangers found in *Bruton,* since it was not a confession at all, but was offered only to authenticate and explain corporate records. Moreover, the government claims that because Weir's testimony was given under oath before a grand jury, it possessed greater indicia of reliability than the oral confession to a postal inspector in *Bruton.* It also argues that the testimony did not clearly implicate Marks in the obscenity conspiracy.

As Judge Celebrezze observed in *Hodges v. Rose,* 570 F.2d 643, 647 (6th Cir. 1978), mere inability to cross-examine does not establish a *Bruton* violation. "Where the extrajudicial statement does not clearly implicate defendants other than the declarant, then the confrontation clause may not be offended by the unavailability of cross-examination". 570 F.2d at 646. The focus of *Bruton* is whether under the circumstances the statement presents a "substantial risk" that the jury will look to it in deciding on the defendant's guilt, in spite of the cautionary instruction. The record convincingly demonstrates that such a substantial risk existed here.

While Weir's grand jury testimony primarily concerned the nature of certain corporate documents of American Amusement, it also directly incriminated Marks. Weir admitted that he was the president of American Amusement Company which supplied much of the film for Cinema X. He admitted that the booking sheets or play date sheets generally showed some connection between American Amusement and Cinema X, though indicating that they could not show if any one particular movie had been shown there. He admitted having infrequently inspected Cinema X and on occasion fixing a projector at other theaters in the chain. Finally Weir essentially admitted that "Deep Throat" had been in possession of American Amusement and implied that the very same copy was seized at Cinema X. In short, Weir's grand jury testimony convincingly demonstrated his intimate knowledge of the business. His direct implication of Marks was probably the most compelling evidence of the latter's role in the operation.

The government attaches importance to Weir's testimony being under oath and thereby being more reliable than the testimony in *Bruton.* Thus it claims the need for cross-examination was reduced. We find such logic unpersuasive and so, apparently, has the Second Circuit. *United States v. Jones,* 402 F.2d 851 (2d Cir. 1968); *cf. United States v. Fiore,* 443 F.2d 112 (2d Cir. 1971), *cert. denied,* 410 U.S. 984, 93 S.Ct. 1510, 36 L.Ed.2d 181 (1973). Absent confrontation, we cannot know whether Weir's respect for the oath would have overcome a "recognized motivation to shift blame onto others." *Bruton, supra,* 391 U.S. at 136, 88 S.Ct. at 1628.[3]

---

3. Such motivation may have been present here, as the government argues that other testimony at trial established that it was Weir, not Marks, who did all the booking for Cinema X.

The government argues that the purposes of cross-examination were served here by the defense attorneys' ability to question Mr. DeFalaise, who read the transcript and had done most of the interrogation before the grand jury. Clearly it was Weir's credibility, not DeFalaise's, which was in issue. Cross-examination of DeFalaise could not substitute for confronting Weir.

The government argues that Marks was not "clearly implicated" by Weir's testimony. It is difficult to understand how this claim could be seriously advanced, especially with respect to the conspiracy charge, since Weir expressly implicated Marks by name.

■ B. The government also contends that Marks waived his right to raise this issue because his attorney did not move to sever his trial from the other defendants and did not request the trial judge to delete all references to him in the grand jury testimony.

Marks correctly replies that the transcript was not used or even offered in the first trial and that he had no reason to believe that it would be introduced at the second trial. The record indicates that defense counsel were furnished with a copy of the transcript the night before trial began. While Marks did not expressly make a motion to delete any references to him, his attorney moved to have the entire transcript excluded, to require the giving of a limiting instruction, and to prevent the witness from reading the inculpatory portions of the transcript. Surely fairness should require no more.

While our circuit has generally approved the deletion of all references to the defendant as a useful alternative to ordering separate trials, *United States v. Dady*, 536 F.2d 675 (6th Cir. 1976), even that practice may not be sufficient when the statement "clearly and unequivocally" implicates the defendant despite the redaction. *Hodges v. Rose, supra.* The government assumes that it is the defendant's burden to expressly request a redaction. We cannot agree. The Supreme Court did not require a motion for severance or deletion to preserve this right in *Bruton*. Neither will we.

■ C. The government also urges that there was abundant evidence of Marks' guilt and hence any *Bruton* violation was harmless beyond a reasonable doubt. *Schneble v. Florida*, 405 U.S. 427, 431, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972); *Burkhardt v. Lane*, 574 F.2d 346 (6th Cir. 1978). In *Schneble*, the Court expanded upon a reviewing court's function in deciding whether constitutional error is harmless. Quoting *Harrington v. California*, 395 U.S. 250, 254, 89 S.Ct. 1726, 1728, 23 L.Ed.2d 284 (1969), the Supreme Court in *Schneble* observed that the court must determine what seems "to have been the probable impact . . . on the minds of an average jury", holding that "unless there is a reasonable possibility that the improperly admitted evidence contributed to the conviction, reversal is not required." 405 U.S. at 432, 92 S.Ct. at 1060.

We believe there was a reasonable possibility that Marks' conviction might not have resulted without the evidence improperly admitted. The government's case was largely based upon circumstantial evidence. There was no direct evidence of a common plan through the testimony of a former co-conspirator. There were no shipping documents showing the actual shipping of either "Deep Throat" or "Swing High". The evidence of Marks' participation by doing the booking for Cinema X was particularly relevant to several elements of the crime. The substantive offense of shipping obscene material through the mail includes a scienter requirement relating to the obscene nature of the materials transported. Although we held in *Marks I, supra*, 520 F.2d at 917, that it was not necessary to prove that the defendants had actual knowledge that the films were obscene under the law, nevertheless the government must show that the defendant "knew the general nature and character of the films". And while the admissible proof of Marks' involvement would be sufficient in our judgment to submit the question to the jury, Weir's grand jury testimony of Marks' direct participation in the booking was the

most convincing of all of the evidence before the jury in support of the scienter requirement. Likewise, Weir's testimony that Marks submitted the booking forms to American Amusement was important in establishing an agreement to transport the obscene films. While there is circumstantial proof that Marks knew that most of his films came from Durand, Michigan, there was no direct evidence that he knew that "Deep Throat" and "Swing High" were to be shipped from out-of-state. If, however, Marks did all the booking, he would surely have been aware that these two films as well as the others came from other states. There is, therefore, a reasonable possibility that this evidence would have persuaded an otherwise uncertain jury to convict.

■■ D. Finally, the government suggested during oral argument that the grand jury testimony was properly admitted under the exception to the hearsay rule for declarations by a co-conspirator,[4] on the theory that when Weir appeared before the grand jury he tried to cover up the conspiracy.[5] However, the exception is applicable only to those statements made in the course of and in furtherance of the conspiracy. Dutton v. Evans, supra; United States v. Mitchell, 556 F.2d 371, 377 n. 6 (6th Cir.), cert. denied, 434 U.S. 925, 98 S.Ct. 406, 54 L.Ed.2d 284 (1977).

■ The indictment charged that the conspiracy existed "from on or about the first day of August, 1970, and thereafter continuously up to approximately the 27th of February, 1973. . . ." Weir appeared before the grand jury on April 16 and April 27, 1973. The government does not argue that the evidence shows the conspiracy continued to exist beyond February 27, 1973, except for this action by Weir to conceal the existence of the conspiracy. Before the new Federal Rules of Evidence the rule was that this exception did not apply to statements made only "during a subsequent period when the conspirators were engaged in nothing more than concealment of the criminal enterprise." Dutton v. Evans, supra, 400 U.S. at 81, 91 S.Ct. at 215. The new federal rule was not intended to change the earlier practice and the government does not argue otherwise. See 11 Moore's Federal Practice § 801.01[6] at VIII–29, § 801.50[6] at VIII–43 (1976), containing excerpts from the Advisory Committee Notes and Senate Report.

## II.

■ Appellant urges that the films involved here are not obscene as a matter of law and thus constitute an expression protected by the free speech provisions of the First Amendment to the United States Constitution. We cannot agree.

In Marks I, Judge Weick, speaking for our court, held that the films were obscene, basing that holding upon the detailed affidavits submitted in support of the search warrants which ultimately produced the films themselves. While the majority of that panel did not conceive that the issue was in serious contention, a dissenting member of the panel suggested that the finding of obscenity had been made without an actual view of the films in question. The United States Supreme Court, in turn, while not requiring a view specifically,[6] not-

---

4. Federal Rule of Evidence 801(d)(2)(E) states:
   A statement is not hearsay if—
   (2) Admission by party-opponent. The statement is offered against a party and is . . (E) a statement by a coconspirator of a party during the course and in furtherance of the conspiracy.
   Thus under the new rules such out-of-court declarations are not even technically defined as hearsay.

5. Where evidence comes within this exception, the confrontation right under the Sixth Amendment is not violated, even if the statement clearly implicates the defendant and the declarant is unavailable for cross-examination. United States v. McManus, 560 F.2d 747 (6th Cir. 1977), cert. denied, 434 U.S. 1047, 98 S.Ct. 894, 54 L.Ed.2d 798 (1978); Campbell v. United States, 415 F.2d 356 (6th Cir. 1969). See Dutton v. Evans, 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970); United States v. Swainson, 548 F.2d 657 (6th Cir.), cert. denied, 431 U.S. 937, 97 S.Ct. 2649, 53 L.Ed.2d 255 (1977).

6. The Supreme Court heard arguments on this question but did not reach it. Marks v. United States, supra, 430 U.S. at 197 n. 13, 97 S.Ct. 990.

ed that a conclusion that the materials were obscene "absent other dependable means of knowing the character of the materials, is of dubious value." *Marks v. United States, supra,* 430 U.S. at 196 n. 11, 97 S.Ct. at 995.

The full panel of this court has now reviewed both films. It was never suggested on the first appeal, nor is it here, that the detailed affidavits which appear in the record of the case and describe scene by scene each film, did not accurately and fairly portray the content thereof. Our actual review of the films themselves reinforces the accuracy of this earlier observation. Under the standards of either *Roth-Memoirs* or *Miller v. California,* we conclude that a jury would be well within the discretion entrusted to it in finding that both films were obscene.

In having reviewed the films, we make it clear that this is not an invariable requirement in all such appeals. Nor do we read the Supreme Court decisions as so holding. Where errors of constitutional proportions are alleged, however, we have a particularly sensitive duty of appellate review. And if there are lesser and greater constitutional rights, surely those pertaining to the freedom of expression guaranteed by the First Amendment are among the greater. Nevertheless, the extent to which an appellate court must, in a given case, delve into the record on appeal, and the extent to which it may fairly rely upon the briefs, appendices and extractions from the record short of an examination of the entire record, must necessarily vary with the circumstances of each case. Therefore, in having reviewed the films involved here, we do not fix an inflexible rule for future panels of this court which may be faced with similar requests, any more than we would endeavor to promulgate a rule that some other panel of the court in some other case must invariably read every page of transcript [or examine every exhibit] of every trial under scrutiny. We observe that neither in this nor in the prior appeal have the appellants specifically pointed to any virtues of the films in question which might characterize them as other than classic examples of hard core pornography, nor did our view of the films reveal any.

## III.

The remaining issues raised by appellant are without merit. As indicated in our review of the proofs in part I, *supra,* there was sufficient evidence without the improper grand jury testimony to support Marks' conviction. Likewise any impropriety in the government's closing argument was adequately cured by the cautionary instructions of the court, and the argument objected to appears primarily to have been responsive to comparable arguments of the defense.

Reversed and remanded for a new trial.