RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 04a0365p.06

# UNITED STATES COURTS OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,

        *Plaintiff-Appellee,*

    *v.*

RODRIGO MACIAS,

        *Defendant-Appellant.*

No. 03-5226

>

Appeal from the United States District Court
for the Western District of Kentucky at Louisville.
No. 00-00049—John G. Heyburn II, Chief District Judge.

Argued: June 10, 2004

Decided and Filed: October 26, 2004

Before: KEITH, CLAY, and GIBBONS, Circuit Judges.

---

## COUNSEL

**ARGUED:** Samuel Manly, LAW OFFICES OF SAMUEL MANLY, Louisville, Kentucky, for Appellant. Terry M. Cushing, ASSISTANT UNITED STATES ATTORNEY, Louisville, Kentucky, for Appellee. **ON BRIEF:** Samuel Manly, LAW OFFICES OF SAMUEL MANLY, Louisville, Kentucky, for Appellant. Terry M. Cushing, Amy M. Sullivan, ASSISTANT UNITED STATES ATTORNEY, Louisville, Kentucky, for Appellee.

    CLAY, J., delivered the opinion of the court, in which KEITH, J., joined. GIBBONS, J. (p. 11), delivered a separate concurring opinion.

---

## OPINION

---

    CLAY, Circuit Judge. Defendant Rodrigo Macias appeals his convictions for conspiracy to possess with intent to distribute 500 grams or more of cocaine, in violation of 21 U.S.C. §§ 846 and 841(a)(1), and attempting to possess with intent to distribute 500 grams or more of cocaine, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. Macias argues that the district court abused its discretion when it denied his motion for a mistrial based on the alleged violation of his right of confrontation that occurred when an inculpatory statement of a non-testifying co-conspirator was introduced at trial. For the reasons that follow, we **REVERSE** Macias' convictions and **REMAND** for a new trial.

1

**I.**

**A.     Substantive Facts**

On March 20, 2000, officers with the Louisville and Jefferson County Metro Narcotics Task Force received information that a Hispanic male from California was registered as a guest at a Red Roof Inn in Louisville, Kentucky and was involved in "suspicious activity."  Later that same day, Metro Narcotics Detectives went to the Red Roof Inn and knocked on the door to Room 337, where the suspect was reportedly staying.  A Hispanic male, later identified as Leonel Amar, answered the door.  The detectives identified themselves and explained the nature of their visit.  They requested and received permission to enter the room.  They asked whether there were any illegal drugs in the room, and Amar said that there were not.  Amar further stated that he was the only person staying in the room.  When the detectives asked if they could search the room for illegal drugs, Amar responded, "Yeah - I just came to visit my cousin."

The detectives noticed that Amar was standing in front of a chest of drawers and began to move toward it.  Amar moved out of the way and, as one of the detectives opened a drawer, but before the contents became visible, Amar stated, "They didn't clean very well – that's not mine!"  Inside the drawer, the detectives found a plastic bag containing several suspected cocaine "pellets" (approximately 650 grams), a digital scale, a plastic Ziploc-brand bag containing powdered laundry detergent, and a Ziploc bag containing latex gloves.  Subsequent laboratory analysis confirmed that the pellets were cocaine hydrochloride, with a net weight of 633.4 grams at 65% purity.

At that point, the detectives placed Amar under arrest and advised him of his *Miranda* rights.  After acknowledging that he understood his rights, he volunteered that he was waiting for someone to pick up the cocaine.  During questioning, he stated that a Hispanic male known to him only as "Jose" was the source.  Amar said that he had met Jose in Louisville during a previous visit in December, 1999, doing construction work.  He said that Jose employed a friend of his known as "Manuel" in an illegal drug transaction, and he recalled that he had recently seen Jose in Mexico City, during which time Jose had asked him to come to Louisville to assist in illegal drug activity.  Amar added that Jose had purchased an airline ticket from Mexico to Louisville for him and subsequently picked him up at the airport when he arrived in Louisville and drove him to the Red Roof Inn.  Amar stated that Jose gave him the plastic bag containing the cocaine, along with other items and $100 in U.S. currency to rent the room.  He added that Jose had told him to secure the bag in the room and would call him before sending someone over to retrieve the bag.

While the detectives were questioning Amar, there was a knock at the door.  When the detectives opened the door, Defendant Macias and Frederico Lopez were standing outside.  Lopez was holding a box of food.  Upon seeing the detectives, Lopez began to walk away, but was directed to stop due to the ongoing criminal investigation.  Macias remained in the doorway.

Macias initially told one of the detectives that he had come to the motel to visit the lounge.  After another detective reported that the motel has no lounge, Macias changed his story and said that he had come to bring food to Amar, whom he reportedly had met in Mexico.  The first detective to speak with Macias interrogated him in English for about a minute, and Macias responded to the detective's questions in fluent English.  When this detective started asking Macias about the drugs that were seized in the motel room, Macias indicated that he no longer spoke English, even though Macias was born in Los Angeles, California, was educated in the California public school system, and resided in Los Angeles.  Macias was then read his *Miranda* rights, and a detective fluent in Spanish was summoned to question him.

During questioning, Macias acknowledged that Amar had called him to the room and told him to bring the laundry detergent and gloves.  Macias said that he had met Amar once in Mexico, and besides Amar calling him to deliver food, that was the extent of their association.  Macias consented to a search of his residence at 1216 Quest Drive, Apartment 3.

Macias had two cellular telephones with him and told the detectives that one of the phones belonged to a man known as "Lupe" or "Guadalupe," for whom he worked on a construction crew. He provided a description of Lupe that was similar to Amar's description of the "Jose," who allegedly was the source of the cocaine found in the motel room. He also had $2,399 in cash on him, and maintained that this money was from the sale of his car to Austin Torres. Torres, however, actually had acquired title to the car five weeks earlier.

During the course of the investigation, the detectives searched a car at the motel. Macias' companion, Frederico Lopez, initially claimed that the car was his and gave consent to search. It was later shown that the car was registered to Macias. The detectives discovered two Western Union receipts identifying the sender as Amar with the address of 2601 Buechel Bank Road. In the trunk, the detectives found laundry detergent in a Ziploc bag and rubber gloves.[1]

Later, during the evening, detectives searched Macias' apartment and found several Ziploc bags in the kitchen area that matched the bags found in Amar's motel room, along with an empty box of powdered laundry detergent, a set of digital scales, and two other sets of scales. Inside a bedroom, they located ledgers consistent with those found in the possession of drug traffickers, showing names of individuals and money amounts totaling over $100,000. Detectives also found inside the residence a telephone bill that Macias maintained was his. It was later determined that the telephone was registered to Amar. They also found a map detailing the location of the Red Roof Inn on Preston Highway and a copy of an American Airlines electronic ticket issued to Amar for a round-trip flight from Mexico City to Louisville on January 18, 2000, with a return flight to Mexico City on January 21, 2000.

In the course of the search, a man, later identified as Jesus Ferrer, entered Macias' residence carrying a cereal box, which was found to contain $18,350. Both Ferrer and another man accompanying him (later identified as Jose Smith) were taken into custody.

Based on the cellular telephone records retrieved from Macias' residence and the descriptions the detectives had previously been provided, the detectives visited the residence of J. Guadalupe Torres at 2106 Buechel Bank Road, Apartment 25. When Torres arrived back at the apartment, he consented to a search in which detectives found several pellets of cocaine similar to the cocaine pellets found at the Red Roof Inn, as well as additional quantities of cocaine found in plastic bundles.

## B.     Procedural History

On May 20, 2002, a jury convicted Macias of conspiracy to possess with intent to distribute 500 grams or more of cocaine, in violation of 21 U.S.C. §§ 846 and 841(a)(1), and attempting to possess with intent to distribute 500 grams or more of cocaine, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. The district court sentenced Macias to 65 months' imprisonment and four years' supervised release. Macias was tried jointly with Ferrer, but the jury was unable to return a verdict against Ferrer. Two other alleged co-conspirators, Amar and Torres, pleaded guilty prior to trial.

On the second day of Macias and Ferrer's trial, Ferrer's attorney conducted a cross-examination of Metro Narcotics Detective Brian Nunn, who had testified as a government witness. Ferrer's attorney sought permission from the district court to play an audio tape recording of Nunn's state court grand jury testimony from December, 2001, in order to impeach Nunn's trial testimony about Ferrer's arrival at Macias' apartment. When the court agreed, the following exchange took place between Macias' attorney (Mr. Simon), Ferrer's attorney (Mr. Williams), and the court.

MR. WILLIAMS: … I'm going to play the tape.

---

[1]According to the testimony of a narcotics officer, laundry detergent is used to mask the smell of drugs from a canine search. He further testified that rubber gloves are used to repackage drugs without leaving fingerprints on the product.

THE COURT:  Okay.  That's fine.

MR. SIMON:  May I ask because I haven't heard the tape, does it mention my client at all?

MR. WILLIAMS:  No.  I mean, I don't know.

MR. SIMON:  That's the only concern I have.  I mean, if he wants to impeach the officer on something dealing with Mr. Ferrer, that's none of my business.  But on the other hand, I do want to make sure that there's nothing that would be prejudicial to Mr. Macias.

THE COURT:  Oh, yeah.  Okay.  Then we'll see you back here at 12:45.…

The court then took a one hour lunch recess.

After the recess, the court reconvened, and Ferrer's attorney continued his cross-examination of Detective Nunn.  The court asked Ferrer's attorney if he was about to play a tape of Nunn's grand jury testimony, and Ferrer's attorney answered affirmatively.  He then played the following excerpt from Nunn's grand jury testimony:

> UNIDENTIFIED FEMALE VOICE:  This is the case of the Commonwealth v. Jesus (inaudible) Ferrer, possession of cocaine.  Would you please state your name and where you work?

> DETECTIVE NUNN:  Brian Nunn, employed by the Louisville Police Department, assigned in the Metro Narcotics Unit.

> UNIDENTIFIED FEMALE VOICE:  And please tell us what happened that led to the defendant being charged, this offense.

*   *   *   *

> DETECTIVE NUNN:  Just to avoid confusion, I'll refer to [the] other two subjects as subjects one and two.  We had received information that subject one was at the Red Roof Inn on Preston Highway here in Louisville, Kentucky in possession of illegal narcotics.  Based on the information in the investigation we did, we conducted a search of his room and recovered approximately 600 grams, over two thirds of a kilo of cocaine.  He immediately began cooperating with us and said that he had came [sic] from El Paso, Texas with cocaine and had been paid by subject two to bring it here to Louisville and that subject two was supposed to pick it up from him at the hotel.

> We stayed at the hotel as subject two eventually arrived.  Based on our investigation, subject two was also placed under arrest and we obtained a consent to search for his residence located on Quest Drive here in the Lynnview section of Jefferson County.  While we were conducting that search, at approximately 9:00 p.m., Mr. Ferrer came to the rear door of that apartment, knocked, and came in.  He was carrying a grocery bag.  Inside the grocery bag was a box of cereal.  The cereal box had a small amount of cereal in it and at the bottom of it was over $18,000 in currency.

Because Nunn's testimony referred to subject two's residence being located on Quest Drive, which is where Macias' apartment is located, Nunn's reference to subject two was a reference to Macias.  Amar, however, never told police that Macias had paid him to bring cocaine to Louisville or that Macias was supposed to pick up the cocaine from the motel.  Thus, Nunn attributed an inculpatory statement to Amar concerning Macias that Amar never in fact made.

After the tape was played, Macias' attorney moved for a mistrial, arguing, "I asked Mr. Williams [Ferrer's attorney] is there anything on that tape that would incriminate my client. He said no. I haven't heard it before. I don't have access to the grand jury, state grand jury proceedings involving his client." Macias' attorney argued that the statement was inadmissible hearsay.

The court did not rule on Macias' motion immediately. The parties subsequently discussed the issue several more times. At one point, the court raised the prospect of admonishing the jury about Nunn's testimony, but expressed concern that such an instruction would draw too much attention to the testimony. The court offered to instruct the jury that Nunn's statement on the tape was "flat out mistaken," "did not occur," and "was a misstatement by the officer." Macias' attorney responded that the statement was so prejudicial that no admonition could cure the problem. The court admitted the tape into evidence for the limited purpose of allowing the court reporter to transcribe its contents. The tape, however, was not available to jurors during their deliberations.

Eventually, the court denied Macias' motion for a mistrial. The court reasoned that the tape did not refer to Macias by name, only as "suspect two"; it was a reference heard only on the tape, which was difficult to hear; and the attorneys would not be permitted to refer to the tape during closing arguments. The judge opted not to instruct the jury about ignoring Nunn's reference to subject two, explaining, "because I thought it was fleeting enough and possibly not well heard enough, I elected that the better course was simply to not say anything, and with the thought that after a few days it would be completely forgotten, which I can't vouch was absolutely going to be the case, but I suspect it's going to be the case."

## II.

We review a district court's denial of a motion for mistrial for an abuse of discretion. *United States v. Atisha*, 804 F.2d 920, 926 (6th Cir. 1986). For the reasons that follow, we hold that the district court abused its discretion in not granting a mistrial based on the violation of Macias' Sixth Amendment right to confront a witness against him.

The Confrontation Clause of the Sixth Amendment, made applicable to the States by the Fourteenth Amendment, guarantees the right of a criminal defendant "to be confronted with the witnesses against him." U.S. CONST. amend. VI; *see also Pointer v. Texas,* 380 U.S. 400, 406 (1965) (holding that the right of confrontation applies to state court proceedings). "The right of confrontation includes the right to cross-examine witnesses." *Richardson v. Marsh*, 481 U.S. 200, 206 (1987) (citing *Pointer*, 380 U.S. at 404, 406-07). "Therefore, where two defendants are tried jointly, the pretrial confession of one cannot be admitted against the other unless the confessing defendant takes the stand." *Id.*

The notion that the admission of inculpatory statements of a non-testifying witness are grounds for a mistrial originated in *Douglas v. Alabama*, 380 U.S. 415 (1965). There, the petitioner, Jesse Douglas, and another individual, Loyd, were tried separately on charges of assault with intent to commit murder. Loyd was tried first and found guilty. Loyd was called as a witness at Douglas' trial, but because Loyd planned to appeal his conviction, he asserted his privilege against self-incrimination and refused to answer any questions. The trial judge rejected Loyd's assertion of the privilege and ordered him to answer the questions, but he still refused. In response, the judge permitted the prosecutor ("the Solicitor") to treat Loyd as a hostile witness and to ask him leading questions. As described by the Court:

> The Solicitor then produced a document said to be a confession signed by Loyd. Under the guise of cross-examination to refresh Loyd's recollection, the Solicitor purported to read from the document, pausing after every few sentences to ask Loyd, in the presence of the jury, 'Did you make that statement?' Each time, Loyd asserted the privilege and refused to answer, but the Solicitor continued this form of questioning until the entire document had been read. [footnote omitted] The Solicitor then called three law enforcement officers who

identified the document as embodying a confession made and signed by Loyd. Although marked as an exhibit for identification, the document was not offered in evidence.

*Id.* at 416-17.

The Court held that Douglas' "inability to cross-examine Loyd as to the alleged confession plainly denied him the right of cross-examination secured by the Confrontation Clause." *Id.* at 419. It was significant for the Court that Loyd's alleged statement about Douglas was "the only direct evidence" that Douglas had committed the crime by firing a shotgun. *Id.* Further, Loyd's description of the circumstances surrounding the shooting "formed a crucial link in the proof both of petitioner's act and of the requisite intent to murder." *Id.* As a result, the admission of the out-of-court statements, without the opportunity for cross-examination, "unfairly prejudiced the defendant." *Id.* at 420.

Three years after *Douglas*, the Supreme Court decided *Bruton v. United States*, 391 U.S. 123 (1968). The petitioner, George Bruton, and his co-defendant, James Evans, were tried jointly and convicted of armed postal robbery. At trial, a postal inspector testified that Evans had confessed to him that Evans and petitioner committed the armed robbery. *Id.* at 124. The judge instructed the jury that "although Evans' confession was competent evidence against Evans, it was inadmissible hearsay against petitioner and therefore had to be disregarded in determining petitioner's guilt or innocence." *Id.* at 125. The Court held, however, that because of the substantial risk that the jury "looked to the incriminating extrajudicial statements in determining petitioner's guilt, admission of Evans' confession in this joint trial violated petitioner's right of cross-examination secured by the Confrontation Clause of the Sixth Amendment." *Id.* at 126. The Court commented that "Evans' confession added substantial, perhaps even critical, weight to the Government's case in a form not subject to cross-examination, since Evans did not take the stand. Petitioner thus was denied his constitutional right of confrontation." *Id.* at 127-28.

In 1987, the Supreme Court decided *Richardson v. Marsh*, *supra*, which limited the application of *Bruton*. In that case, Clarissa Marsh and Benjamin Williams were charged with murder, robbery and assault, and were tried jointly. At trial, Williams' written confession was admitted over objection. Williams did not testify. The confession had been redacted to omit all reference to Marsh. Williams' confession described a conversation he had with the third accomplice (not Marsh) as they drove to the victim's house, during which that accomplice said that he would have to kill the victims after robbing them. No mention was made of Marsh or anyone else being in the car. The jury was admonished not to use the confession in any way against Marsh. Marsh's subsequent testimony indicated that she had been in the car with Williams and the third accomplice, but that she had not heard the conversation due to the volume of the radio, insisting that she had not intended to rob or kill anyone. During closing arguments, the prosecutor linked Marsh to the portion of Williams' confession describing his conversation with the third accomplice in the car.

The Court described its holding in *Bruton* as follows: "We held that a defendant is deprived of his Sixth Amendment right of confrontation when the *facially incriminating* confession of a nontestifying codefendant is introduced at their joint trial, even if the jury is instructed to consider the confession only against the codefendant." *Richardson,* 481 U.S. at 207 (emphasis added). The Court noted that in *Bruton* "the codefendant's confession 'expressly implicat[ed]' the defendant as his accomplice" and proved to be "'powerfully incriminating.'" *Id.* at 208 (quoting *Bruton*, 391 U.S. at 124 n.1, 135). By contrast, in Marsh's case, Williams' confession "was not incriminating on its face, and became so only when linked with evidence introduced later at trial (the defendant's own testimony)." *Id.* The Court reasoned that, unlike a *Bruton*-type case, where the jury cannot be trusted to follow a judicial instruction to ignore an inculpatory statement of a non-testifying accomplice, such a concern is less valid "[w]here the necessity of such linkage is involved," as in Marsh's case. *Id.* Thus, the Court held that "the Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when, as here, the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence." *Id.* at 211.

In *Gray v. Maryland,* 523 U.S. 185 (1998), the Supreme Court answered a question left open in *Richardson* – the "admissibility of a confession in which the defendant's name has been replaced with a symbol or neutral pronoun." *Richardson,* 481 U.S. at 211 n.5. In *Gray,* the prosecution redacted the non-testifying co-defendant's (Anthony Bell) confession by substituting for the defendant's name in the confession a blank place or the word "deleted." Immediately after a police detective read the confession into evidence, the prosecutor asked, "[A]fter [Bell] gave you that information, you subsequently were able to arrest Mr. Kevin Gray; is that correct?" The officer responded, "That's correct." The trial judge instructed the jury that Bell's statement was evidence only against Bell and should not be used as evidence against Gray. *Gray,* 523 U.S. at 189-90.

The Court distinguished Gray's case from the facts in *Richardson* on the ground that the confession "refer[red] directly to the 'existence' of the nonconfessing defendant," simply replacing the nonconfessing defendant's name with a kind of symbol (the word "deleted" or a blank space). *Id.* at 192. The Court found that "considered as a class, redactions that replace a proper name with an obvious blank, the word 'delete,' a symbol, or similarly notify the jury that a name has been deleted are similar enough to *Bruton*'s unredacted confessions as to warrant the same legal results." *Id.* at 195. By contrast, in *Richardson*, the admitted statements "did not refer directly to the defendant himself [sic] and … became incriminating 'only when linked with evidence introduced later at trial.'" *Id.* at 196 (quoting *Richardson*, 481 U.S. at 208). Statements like those admitted in Gray's trial, despite the redactions, "obviously refer directly to someone, often obviously the defendant, and which involve inferences that a jury ordinarily could make immediately, even were the confession the very first item introduced at trial." *Id.* Moreover, a confession containing blanks 'facially incriminat[es]' the codefendant." *Id.*

Based on the foregoing precedent, we hold that Nunn's testimony about co-conspirator Amar's alleged statement about Macias triggered Macias' constitutional right to confrontation. The government's case against Macias was based entirely on circumstantial evidence, primarily the following: (1) Macias showed up at the motel room where detectives had discovered over 600 grams of cocaine and where the suspect in the room (Amar) had told them that the ringleader of the investigation (Torres) would be sending someone over to pick up the drugs; (2) Macias initially lied to detectives about his reason for visiting the hotel; (3) Macias lied to detectives about the extent of his relationship and contacts with Amar; (4) Macias appeared to feign the inability to speak English when detectives began to ask him about drugs found in the motel room; (5) Macias had a cellular telephone with him that belonged to Torres, the source of the cocaine; (6) Macias had $2,399 in cash on him that supposedly came from the sale of his car five weeks earlier; (7) a search of Macias' car revealed two Western Union receipts from Amar and laundry detergent and latex gloves in Ziploc bags, matching the items found with the drugs in Amar's hotel room; (8) a search of Macias' apartment uncovered Ziploc bags in the kitchen area that matched the bags found in Amar's motel room; an empty box of powdered laundry detergent, a set of digital scales and two other sets of scales; ledgers consistent with those found in the possession of drug traffickers, showing names of individuals and money amounts totaling over $100,000; a telephone bill of a phone registered to Amar; a map detailing the location of the Red Roof Inn where the drugs were found; and a copy of an airline ticket issued to Amar for a round-trip flight from Mexico City to Louisville; and (9) while searching Macias' apartment, Macias' codefendant entered the apartment with a cereal box containing $18,350.

This evidence was certainly sufficient for a jury to have found Macias guilty of conspiracy to possess with intent to distribute 500 grams or more of cocaine and attempt to possess such amounts of cocaine. The evidence, however, was not so overwhelming that Amar's alleged statements did not add significant weight to the government's case: Macias had not confessed to these crimes and there was no physical evidence directly linking Macias to the cocaine; thus, the jury had to draw an inference to connect the laundry detergent, latex gloves and Ziploc bags (perfectly legal items) to similar items in Amar's possession. The jury was required to infer that Macias was part of the drug conspiracy by virtue of his contacts with Amar and Torres (e.g., the cellular telephone, telephone bills and the airline ticket); the presence of cash on his person; and a drug ledger, scales and Ziploc bags in his apartment and his car. No doubt, the government presented a strong case against Macias, but it was not open and shut. As a consequence, Officer Nunn's

testimony about Amar's alleged statement that "subject two" (i.e., Macias) had paid him to bring cocaine to Louisville and that Macias was supposed to pick up the cocaine from the motel transformed the government's case into a direct evidence case. Amar (through the testimony of Nunn) directly linked Macias to the drug conspiracy, rendering it largely unnecessary for the jury to infer Macias' involvement in the conspiracy based on the circumstantial evidence.

In this sense, Macias' situation is comparable to *Douglas*, where the Court found an extrajudicial statement to be unfairly prejudicial to the defendant because it was "the only direct" evidence that the defendant had committed the crime and "formed a crucial link" in the proof both of defendant's act and of the requisite intent. *See Douglas*, 380 U.S. at 419. It also is comparable to *Bruton*, where the Court found the extrajudicial statement had "added substantial, perhaps even critical, weight to the Government's case in a form not subject to cross- examination," and therefore denied the defendant his constitutional right of confrontation. *See Bruton*, 391 U.S. at 127-28.

We do not believe the facts of this case are governed by *Richardson*. There, the extrajudicial confession "was not incriminating on its face, and became so only when linked with evidence introduced later at trial (the defendant's own testimony)." *Richardson*, 481 U.S. at 208. Before its presentation to the jury, the confession in *Richardson* purged any reference not only to the defendant, but also to her very presence at the scene where the incriminating statements were made. *Id.* at 203. The only way the jury could connect the defendant to the scene was through her subsequent testimony that she had been at the scene. In Macias' situation, however, Amar's alleged inculpatory statement (as presented by Nunn) referred directly to "subject two," who resides on Quest Drive. Although the statement did not name Macias directly, the description of subject two was sufficiently specific that it could have referred only to Macias. Thus, the statement was incriminating on its face.

The government argues that there is no Confrontation Clause issue because the United States did not proffer Amar's statement. Rather, his co-defendant did. This fact is irrelevant. None of the language in the principal Supreme Court cases addressing the issue (*Douglas*, *Bruton*, *Richardson*, and *Gray*) suggests that the source of the extrajudicial statement is material, unless the defendant himself introduced the statement at trial or somehow invited the introduction of that statement.

The government further argues that there is no Confrontation Clause issue because the non-testifying accomplice, Amar, did not actually make the statement that was introduced at Macias' trial. According to the government, Detective Nunn "turned Amar's statement into a *Bruton*-type statement by misquoting him during his grand jury testimony," but that "*Bruton* only applies to a non-testifying codefendant's extrajudicial statement that implicates the defendant." *Br. for the United States* at 19-20. The government argues that "the damage done (if any) by the erroneous statement could have been rectified by cross-examining the detective." *Id.* at 20.

The Supreme Court rejected this very argument in *Douglas*. In that case, someone other than the defendant's accomplice – the prosecutor – had effectively testified against the defendant by reading the non-testifying accomplice's written confession in open court. *Douglas,* 380 U.S. at 416-17, 419 ("Although the Solicitor's reading of Loyd's alleged statement, and Loyd's refusals to answer, were not technically testimony, the Solicitor's reading may well have been the equivalent in the jury's mind of testimony that Loyd in fact made the statement[.]") Three officers then authenticated the written confession. *Id.* at 417. The Court held that the opportunity to cross-examine the three officers was no substitute for cross-examination of Loyd. *Id.* at 419-20. Because the officers' testimony "tended to show only that Loyd made the confession, cross-examination of them as to its genuineness could not substitute for cross-examination of Loyd to test the truth of the statement itself." *Id.* at 420 (citations omitted). "[E]ffective confrontation of Loyd was possible only if Loyd affirmed the statement as his." *Id.* In Macias' case, Nunn stood in a similar position as the three officers in *Douglas*. He testified about a statement that Macias' accomplice, Amar, supposedly made, but only cross-examination of Amar could test the truth of the statement itself.

This Court also rejected the government's argument in *United States v. Marks,* 585 F.2d 164 (6th Cir. 1978). At Stanley Marks' trial for transporting obscene materials in interstate commerce, government attorney Louis DeFalaise read into evidence the prior recorded grand jury testimony he had obtained from a codefendant, Guy Weir. The grand jury testimony not only authenticated certain business records, but also indicated that Marks had booked the allegedly obscene movies at a theater. This testimony directly implicated Marks by name and was the only evidence linking him to the operation of the theater and showing the interstate commerce element of the offense. The Court held:

> The government argues that the purposes of cross-examination were served here by the defense attorneys' ability to question Mr. DeFalaise, who read the transcript and had done most of the interrogation before the grand jury. Clearly it was Weir's credibility, not DeFalaise's, which was in issue. Cross-examination of DeFalaise could not substitute for confronting Weir.

*Id.* at 169. Similarly, in Macias' case, the issue was not the credibility of Nunn's testimony about Amar's purported inculpatory statement, but Macias' right to confront Amar, whom Nunn had transformed into an accuser through his false testimony. We hold that the admission of Detective Nunn's grand jury testimony about Amar's alleged inculpatory statement ran afoul of Macias' confrontation clause rights under *Bruton* and similar cases.

"The mere finding of a violation of the *Bruton* rule in the course of the trial, however, does not automatically require reversal of the ensuing criminal conviction." *Schneble v. Florida*, 405 U.S. 427, 430 (1972). "In some cases the properly admitted evidence of guilt is so overwhelming, and the prejudicial effect of the codefendant's admission is so insignificant by comparison, that it is clear beyond a reasonable doubt that the improper use of the admission was harmless error." *Id.* "[U]nless there is a reasonable possibility that the improperly admitted evidence contributed to the conviction, reversal is not required." *Id.* at 432 (citing *Chapman v. California,* 386 U.S. 18, 24 (1967))

In *Schneble*, the Supreme Court held that the *Bruton* violation was harmless error because an average jury would not have found the prosecution's case "significantly less persuasive" had the extrajudicial statement been excluded. *Id.* The independent evidence of guilt was overwhelming, and the admitted statement at most tended to corroborate certain details of the defendant's comprehensive confession. *Id.* at 431. By contrast, in *Marks*, this Court found no harmless error because the "government's case was largely based upon circumstantial evidence." *Marks*, 585 F.2d at 169. "There was no direct evidence of a common plan [other than] through the testimony of a former co-conspirator." *Id.* The Court found that there was "a reasonable possibility that this evidence would have persuaded an otherwise uncertain jury to convict." *Id.* at 170.

As discussed above, the government's case against Macias was based solely on circumstantial evidence. The statements imputed to Amar – that Macias had paid him to bring cocaine to Louisville and that Macias was supposed to pick up the cocaine from the motel – made the government's case against Macias significantly more persuasive because they directly linked Macias to the drug conspiracy. Unlike in *Schneble*, the independent evidence of guilt was not overwhelming. Rather, like *Marks,* the case against Macias was based on circumstantial evidence, giving rise to a reasonable possibility that the statements attributed to Amar may have persuaded an otherwise uncertain jury to convict. The district court certainly made no findings that would detract from this conclusion, instead relying on its suspicion and hope that the jury probably did not pay much attention to Nunn's tape-recorded statement. It would be inappropriate to override Macias' confrontation rights based on such conjecture.

The government also argues that Macias waived his right to raise the *Bruton* issue because his attorney invited the improper testimony from Nunn. "'The doctrine of 'invited error' refers to the principle that a party may not complain on appeal of errors that he himself invited or provoked the court or the

opposite party to commit.'" *United States v. Sharpe,* 996 F.2d 125, 129 (6th Cir. 1993) (quoting *Harvis v. Roadway Express, Inc.*, 923 F.2d 59, 60 (6th Cir.1991) (citation omitted in *Harvis*)).

The record shows that Macias' attorney was aware of the very real possibility that Nunn's grand jury testimony about Amar's extrajudicial statement referred to Macias and might implicate him. The trial transcript shows that Macias' attorney asked the attorney for his co-defendant, Ferrer, who had sought to introduce the statement, whether the tape referred to Macias. Ferrer's attorney responded, "No. I mean, I don't know." Thus, Macias was on notice that the tape might refer to him. There was a one hour recess before the tape was played before the jury. Macias, however, never listened to the tape in the interim, nor did he ask the court for time to review it. Arguably, Macias acquiesced in the presentation of this testimony, making him responsible for any alleged *Bruton* violation. *Cf. Marks*, 585 F.2d at 169 (holding that the defendant did not invite *Bruton* violation because he had no reason to believe that the non-testifying witness' grand jury testimony would be introduced at trial and his attorney had "moved to have the entire transcript excluded, to require the giving of a limiting instruction, and to prevent the witness from reading the inculpatory portions of the transcript").

Although the government's waiver argument has superficial appeal, courts typically have found invited error in the *Bruton* context where the defendant, or his attorney, has taken an affirmative action to invite the error, such as by introducing the extrajudicial statement at trial or by stipulating to such statement's admissibility. *E.g., United States v. Jernigan,* 341 F.3d 1273, 1290 (11th Cir. 2003) (holding that defendant's attorney invited the admission of the taped extrajudicial statements; "by affirmatively agreeing to the playing of the tapes, Jernigan effectively caused, i.e., invited, any *Bruton* error that resulted from the jury's hearing them"). Here, however, Macias' attorney took no such affirmative step. Rather, he merely failed to listen to the tape in advance and determine whether it referred to his client. This passive error may be explained by the equivocal "No/I don't know" answer provided by Ferrer's attorney when Macias' attorney asked about whether the content referred to his client. Given the important constitutional right at issue, we hold that the invited error doctrine should not apply where neither Macias, nor his attorney, were on sufficient notice that an extrajudicial, inculpatory statement was likely to be introduced at trial. Because Macias did alert the district court to the potential for a *Bruton* violation, it was incumbent on the court to listen to the tape prior to permitting its introduction. Of course, an attorney cannot simply "stick his head in the sand" and ignore the very real possibility of a *Bruton* violation. But here, the fact that Macias had no idea before trial that such a statement might be introduced, combined with Ferrer's attorney's equivocal answer, raises significant doubt about whether Macias had sufficient notice of this possibility.

Last, we hold that Macias did not invite the *Bruton* violation by rejecting the district court's offer to admonish the jury about Nunn's testimony. Because Detective Nunn's statements were so prejudicial to Macias' defense, an admonition would have been useless.

### III.

For all the foregoing reasons, Macias' convictions must be **REVERSED** and this case **REMANDED** for a new trial.

---

**CONCURRENCE**

---

JULIA SMITH GIBBONS, Circuit Judge, concurring. I concur and make two observations. First, because the testimony given by Detective Nunn about Amar's statement was untrue, this case does not fit neatly into the *Bruton* line of authorities. Even if we applied some other analytical framework to the issue of admissibility of the testimony, however, the result is clear. Admission of an inculpatory statement that was never made can hardly be said to jeopardize a defendant's rights less than admission of one that was made.

Second, in concluding that the error in admitting the tape was not harmless, it is of particular importance that the tape was a portion of Nunn's sworn state grand jury testimony. The jury, which had no basis for knowing that the testimony was false, would likely believe that such a statement, made by a law enforcement officer testifying under oath, was entirely truthful. Moreover, the statement clearly refers to Macias, although it does not use his name. For these reasons, the error was not harmless in my view, despite the quite substantial circumstantial evidence of guilt.