NOT RECOMMENDED FOR PUBLICATION
File Name: 05a0685n.06
Filed: August 9, 2005

No. 04-3473

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

DAVID FOX,                                    )
                                              )
        Petitioner-Appellant,                 )
                                              )    ON APPEAL FROM THE UNITED
v.                                            )    STATES DISTRICT COURT FOR THE
                                              )    SOUTHERN DISTRICT OF OHIO
PAT HURLEY, WARDEN,                           )
                                              )
        Respondent-Appellee.                  )    OPINION
                                              )

**Before: KENNEDY, CLAY, and GILMAN, Circuit Judges.**

**RONALD LEE GILMAN, CIRCUIT JUDGE.** David Fox was convicted by a jury in an Ohio state court for the murder of Montel Young in March of 2000. Young was shot in Fox's residence in connection with a home invasion by three armed men who had broken in to rob Fox. Numerous alleged errors by Fox's trial counsel purportedly deprived him of his constitutional rights. After exhausting his state-court remedies, Fox petitioned for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, alleging four grounds for relief. The district court denied Fox's petition, but granted him a certificate of appealability with respect to two of his claims. These claims are that Fox was allegedly denied (1) his Sixth Amendment right to the effective assistance of counsel, and (2) his Fifth Amendment right to a fair trial. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I. BACKGROUND

## A.    Factual background

A lengthy and detailed description of the factual circumstances underlying Fox's appeal can be found in the magistrate judge's Report and Recommendation, which quotes extensively from the facts as found by the Ohio Court of Appeals for the Tenth District. *See State v. Fox*, No. 01AP-322, 2002 WL 378063 (Ohio Ct. App. 2002) (unpublished). In the interests of brevity, however, only the key facts are recounted in this opinion.

On March 19, 2000, Fox and his longtime friend, Renzo Padovan, worked for several hours installing a back door on Fox's home. Fox and Padovan each consumed at least 24 beers while doing this work. At some point during the day, Fox took a break from working on the door to go down to his basement to practice fire a nine-millimeter handgun that he owned. He brought the gun upstairs after he was done and stored it in his kitchen.

When Fox and Padovan finished installing the door, they went across the street to a bar and drank even more alcohol. While they were in the bar, Fox pulled out a large roll of bills, totaling $3,700. Fox had received this money from a man for whom he had agreed to do some carpentry work. At this time, several patrons of the bar observed that Fox was in possession of a large amount of cash. Among them was a local prostitute, Montel Young.

Fox and Padovan ordered food from a Chinese restaurant next to the bar and returned to Fox's house to eat it. They began drinking beer again and also ingested some cocaine together. A short while later, Young came over to Fox's house and offered to engage in sexual activity with the two men in return for $20. Fox paid her, and Young began to perform oral sex on him while

Padovan waited for his turn. This encounter was interrupted, however, when knocking was heard at the back door and Fox got up to answer.

A man at the door asked for "my aunty" and another asked for "my sis." Three African-American men then broke through the door, pushing Fox back into the middle of the house. The men were wielding pistols and at least one shotgun, the butt of which was used to beat Padovan unconscious. Their attention then turned to Fox. They demanded that he give them the roll of bills that he had flashed earlier at the bar. When Fox hesitated, the robbers began to beat him, chipping several of his teeth, breaking his nose, and bloodying his face. Fox recalled that Young, a 5'11" woman weighing 234 pounds, intentionally tripped him as he went from one room to the next trying to fend off the blows of his attackers. Young also held him down to assist the robbers in searching his clothing for the money.

At some point during the beating, Fox temporarily lost consciousness. When he regained his senses, he claims that he saw the robbers fleeing out the back door and Young bent over collecting some of the bills that they had dropped on their way out. Fox had a difficult time seeing because he is permanently blind in his left eye, and his right eye had blood streaming into it from a large cut on his forehead. Nevertheless, he managed to get up and retrieve his nine-millimeter gun from the kitchen. He moved toward the back door with the gun, but, as he approached the doorway, he allegedly heard one of the robbers outside threaten to kill him. Then, according to Fox, at least one shot was fired from outside the house. Fox says that he retreated from the doorway, while at the same time returning fire. He insists that at no point during this exchange of gunfire did he become aware of the fact that Young had been shot.

Padovan began to regain consciousness near the end of the attack, and he remembers seeing Fox retrieve his gun. When he was first interviewed by police shortly after the shooting, Padovan was unable to remember how many shots were fired or by whom. But he did recall seeing Young laying on the floor, holding her stomach, and saying "I've been hit." In later statements to the police and in his testimony at trial, however, Padovan reported that Fox shot Young in a fit of rage after the robbers had already fled.

When the men outside quit shooting, Fox testified that he went out the back door in pursuit of his attackers. He neither found them nor did he return to his residence to check on Padovan or to confront Young about her role in the robbery. Instead, Fox got in his van and drove to his uncle's house. Someone at his uncle's house then called emergency personnel, and Fox was rushed to a hospital to receive treatment for his many injuries sustained during the beating.

At the hospital, a police officer interviewed Fox regarding the assault and robbery. The officer noted that Fox appeared intoxicated and kept falling asleep during the interview. Fox told the officer that three African-American men had kicked in his back door, fired gunshots, and robbed him of $3,700. He repeatedly stated that he had been "set up," but did not provide any explanation. Fox never mentioned that anyone in his house had been shot.

Early the next morning, Fox was released from the hospital. Still intoxicated and covered in blood, he returned home and discovered Young's body in his living room. This caused Fox to become very upset. Because he did not know what to do, he covered Young's body with a sheet and placed several frantic phone calls. One of these calls was to Padovan, who told Fox that he should get rid of his gun and call the police. (At trial, Fox testified that the gun was already missing from

his house when he returned from the hospital.)  Fox also called an acquaintance who was a lawyer and asked whether he should "do anything, you know, wait there, take off, what?"

After making these phone calls, Fox called the police.  When the police arrived, he told the investigating officers the same version of events that he had recounted at the hospital a few hours earlier, but he denied that he possessed or fired a gun during the attack by the robbers.  After the police investigation began to focus on Fox, he fled to Texas.  He claimed that he did so because he feared retribution from Young's family, but he also admitted that he was worried that he would be arrested for her murder.

An autopsy later revealed that Young had died as a result of a single gunshot wound.  The bullet entered her body just beneath her left armpit and then split into fragments, puncturing both of her lungs and passing through the major blood vessels near her heart.  This gunshot wound was not immediately fatal, but the forensic pathologist who examined Young could not determine how long she lived after being shot.  Ballistic testing later determined that the bullet came from the gun that Fox possessed and fired in connection with the home invasion by the robbers.  The testing was done by comparing the bullet fragments found in Fox's basement with the remnants of the fatal bullet because the gun that Fox fired during the break-in was never found.

**B.**     **Procedural background**

Fox was indicted in May of 2000 for the murder of Young.  At his trial in the Court of Common Pleas in Franklin, Ohio, Fox was represented by two retained attorneys, Lou Dye and Christopher Cicero.  Following a seven-day trial, the jury found Fox guilty of aggravated murder and of possessing a firearm in connection with the offense.  Ohio Rev. Code §§ 2903.01, 2941.145.

The court sentenced him from 20 years to life in prison for the murder, with an additional 3 years of imprisonment for the offense of possessing the firearm.

Represented by new, court-appointed counsel, Fox appealed his conviction and sentence to the Ohio Court of Appeals for the Tenth District. *See State v. Fox*, No. 01AP-322, 2002 WL 378063 (Ohio Ct. App. 2002) (unpublished). Fox raised five assignments of error, including the claims that he now advances in the present habeas proceeding. With respect to one of his assignments of error—that the evidence was insufficient to support his conviction for aggravated murder—the state appellate court found in Fox's favor and reduced his conviction to the lesser-included offense of murder. On remand, Fox was sentenced from 15 years to life in prison. Fox appealed the appellate court's denial of his other assignments of error to the Ohio Supreme Court, but the Court declined to hear his case. *See State v. Fox*, 772 N.E.2d 1202 (Ohio 2002) (table decision).

Having exhausted his state-court remedies, Fox filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 in the United States District Court for the Southern District of Ohio. His petition, which raised four grounds for relief, was referred to a magistrate judge for a Report and Recommendation. The magistrate judge recommended that the petition be dismissed. After considering Fox's objections, the district court adopted the magistrate judge's recommendation and dismissed the petition. The district court then granted Fox a certificate of appealability with regard to the two issues that he now raises in the present action. This timely appeal followed.

## II. ANALYSIS

**A.      Standard of review**

"When reviewing a denial of habeas corpus relief, this court reviews the district court's legal conclusions *de novo* and its factual findings under a 'clearly erroneous' standard." *Baze v. Parker*, 371 F.3d 310, 371 (6th Cir. 2004). Fox filed his petition for a writ of habeas corpus on September 6, 2002. Because this was after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), the amended provisions of 28 U.S.C. § 2254(d) are applicable to our review of Fox's petition. *See Williams v. Taylor*, 529 U.S. 362, 412 (2000) (stating that AEDPA's enactment placed "a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court").

Pursuant to AEDPA, we may grant Fox a writ of habeas corpus only if "the state-court adjudication resulted in a decision that (1) 'was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States,' or (2) 'involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States.'" *Jordan v. Hurley*, 397 F.3d 360, 362 (6th Cir. 2005) (quoting § 2254(d)(1)) (citation omitted). "A state court's decision is contrary to clearly established Federal law if it (1) arrives at a legal holding that contradicts a Supreme Court precedent or (2) involves facts that are materially indistinguishable from a Supreme Court case but nonetheless arrives at a substantially different result." *Miskel*, 397 F.3d at 451 (citing *Taylor*, 529 U.S. at 405-406). "An unreasonable application of clearly established Federal law occurs if 'the state court identifies the correct governing legal rules from the [Supreme] Court's cases but unreasonably applies it to the facts of the particular prisoner's case' or if the state court extends a Court precedent to a context where it should not apply, or fails to extend

it to a context where it should apply." *Id.* (quoting *Taylor*, 529 U.S. at 406-409) (alteration in original).

**B.    The state court's determination that Fox had received the effective assistance of counsel is not contrary to or an unreasonable application of clearly established federal law**

Fox contends that his Sixth Amendment right to the effective assistance of counsel was violated when his counsel (1) tried to bribe a prosecution witness, (2) submitted contradictory theories of the case to the jury, (3) failed to object to unfairly prejudicial evidence, (4) failed to impeach an important prosecution witness, (5) spoke with Fox at a recess during his cross-examination by the prosecutor, and (6) was continually reprimanded by the trial court in front of the jury for outrageous behavior and abuse of the evidentiary rules.

In order to prevail on his ineffective-assistance-of-counsel claim, Fox must satisfy the two-prong test set out by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 688 (1984). Under this test, Fox must (1) "show that counsel's performance was deficient," and (2) "that the deficiency prejudiced the defense." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003); *see also Strickland*, 466 U.S. at 697 ("[T]here is no reason for a court deciding an ineffective assistance claim to . . . address both components of the inquiry if the defendant makes an insufficient showing on one.").

Fox's counsel was deficient only if the representation provided "fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. "The objective standard of reasonableness for counsel is defined in terms of prevailing professional norms." *Howard v. Bouchard*, 405 F.3d 459, 479 (6th Cir. 2005) (citing *Strickland*, 466 U.S. at 688). And in order to establish prejudice, Fox must "show that there is a reasonable probability that, but for counsel's unprofessional errors,

the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

### 1. Counsel's conversation with a prosecution witness

The most troubling of Fox's allegations is his claim that his counsel attempted to bribe a prosecution witness, and that the jury was aware of this alleged bribery attempt. Padovan, who had previously testified as a witness for the state, was called by the defense to testify regarding a conversation that he had had with an acquaintance. He was questioned about statements that he made to the acquaintance when he allegedly admitted that he did not know what had happened the night that Young was killed, but that he had later implicated Fox to avoid being charged with the crime himself. During the state's cross-examination, however, Padovan revealed that he had telephoned one of Fox's attorneys, Dye, and that the two had discussed the testimony that Padovan had given earlier in the trial as a witness for the prosecution. The exchange during cross-examination between the prosecutor and Padovan was as follows:

> Q: Mr. Padovan, you had a telephone conversation with Mr. Dye after you testified [for the state]?
>
> A: Yep.
>
> Q: And you called him?
>
> A: Well, my buddy . . . is in trouble right now, [Dye] said he would help him on his case.
>
> . . .
>
> Q: And why did that lead you to call Mr. Dye over the weekend?
>
> A: Well, I was going to see if we could meet him that weekend, you know, help him out with his fence. . . . Actually, he was going to

> help me a little bit, I needed some stuff done at my house, might need a lawyer, and I asked him if he would do that, too, he said he would.
>
> Q: Did he also tell you that you could have helped his client out a little better in court when you testified?
>
> A: Yep.
>
> Q: He told you [that] you could have helped out your buddy a little more, didn't he?
>
> A: Yeah. I don't see how I can, I already told the detectives what happened, so I don't see how I can help him; they have that on tape. . . . I just, I remember telling him I already told it on tape, you know, I had to stick to my story.

This entire exchange, which Fox characterizes as a "revelation of attempted bribery," was conducted before the jury. Although Dye disputed the version of events related by Padovan in a conference before the trial judge, no attempt was made to further question Padovan about the conversation. Fox argues that this exchange sent a "crippling message" to the jury "that defense counsel thought his client was guilty, so he had to cheat to win."

When presented with Fox's argument, the state appellate court observed the following:

> "The trial transcript reflects a long-term acquaintance between Mr. Padovan and one of the defense attorneys. The attorney had been representing Mr. Padovan's friends and perhaps Mr. Padovan himself off and on for many years. Under the circumstances, many defense attorneys would have declined the opportunity to represent Mr. Fox, who also had been friends with Mr. Padovan for many years. Under the circumstances, many attorneys would have avoided discussions about doing favors for the key prosecution witness who was expected to testify in response to a defense subpoena within the next few days. This defense attorney took the call and had an ill-advised conversation with the witness."

*Fox*, 2002 WL 378063 at *11. Although the court did not articulate its reasoning in terms of *Strickland*, it appears to have concluded that Fox satisfied the first prong of the test by showing that

his counsel's conduct fell short of the ethical standard adhered to by most attorneys. *Strickland*, 466 U.S. at 688 ("The proper measure of attorney performance remains simply reasonableness under prevailing professional norms.").

Nevertheless, the state appellate court ultimately concluded that it could not "find that counsel rendered ineffective assistance of counsel, given the high standard for finding ineffective assistance mandated by the Supreme Court of the United States in *Strickland*." *Fox*, 2002 WL 378063 at *10. This was, in effect, a reference to the second prong of the *Strickland* test—that his counsel's "deficiency prejudiced the defense." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (citation omitted). The state appellate court determined that Fox was not prejudiced because "[t]he jury presumably was capable of distinguishing between the guilt of the accused and the actions of his attorney." *Fox*, 2002 WL 378063 at *11.

During his cross-examination by the prosecutor, Padovan repeatedly stated that his previous testimony had been truthful and that he had not in fact altered his testimony in response to his conversation with Fox's counsel. There was also substantial evidence, apart from Padovan's testimony, that implicated Fox in Young's murder. Among this evidence was the ballistics matchup of the fatal bullet to Fox's gun, the mysterious disappearance of the gun so that it could not be used for ballistics testing, and Fox's flight to Texas after he became concerned that he was a suspect in the investigation.

The fact that Dye engaged in an inappropriate conversation with Padovan, absent some showing of prejudice to Fox, does not compel a finding that Fox received the ineffective assistance of counsel. *See Nix v. Whiteside*, 475 U.S. 157, 165 (1986) ("Under the *Strickland* standard, breach

of an ethical standard does not necessarily make out a denial of the Sixth Amendment guarantee of assistance of counsel."). Although he contends that the jury must have been swayed by its bad opinion of his lawyer, Fox has failed to point to any evidence in the record that suggests that his counsel's conduct "actually had an adverse effect on the defense." *Strickland*, 466 U.S. at 693 ("It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding.").

Moreover, in charging the jury, the trial court specifically admonished it to disregard anything that it might perceive to be "an indication of the Court's view of the facts," and to reach its verdict "with intelligence and with impartiality, and without bias, sympathy or prejudice." We have no reason to believe that the jury did otherwise. *See Strickland*, 466 U.S. at 695 ("The assessment of prejudice should proceed on the assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision."). Fox points to nothing in the record that even suggests that the jury "punished [him] for the sins of his trial counsel," as he alleges. We thus conclude that the state appellate court properly applied the *Strickland* test in deciding that the verdict of the jury was unaffected by the revelation that Fox's attorney had spoken with Padovan.

### 2. *Counsel's courtroom conduct*

Fox further alleges that he was prejudiced because both of his counsel were continually reprimanded by the trial court in front of the jury for outrageous behavior and abuse of the evidentiary rules. The transcript reveals that Fox's attorneys were repeatedly rebuked for their courtroom behavior, including such admonishments as "you know what you're doing here is wrong,

now stop it, or you're going to have some big problems here." Fox claims that the trial court judge "became so frustrated with defense counsel, he refused to allow [Dye] to approach the bench to make a record outside the hearing of the jury." He also contends that the court ruled against him on evidentiary issues because of the court's displeasure with the tactics of his counsel. These exchanges are evidence, Fox maintains, that his lawyers' courtroom conduct biased the judge and jury against Fox and resulted in his conviction.

The state appellate court acknowledged that counsel's "[p]ushing the envelope with respect to the evidence led to several interchanges between the trial judge and defense counsel which cannot have had a favorable impact on the jury when it came time to deliberate." *Fox*, 2002 WL 378063 at \*10. It further observed that "[h]indsight reveals a number of places in the trial transcript where a better approach could have been used and a better understanding of the Ohio Rules of Evidence could have been demonstrated." *Id.* But this did not lead the court to conclude that, but for his counsel's conduct, Fox would not have been convicted of Young's murder. Although his attorneys' antics might not have been the best trial strategy, the court concluded that the "several interchanges between the trial judge and defense counsel . . . demonstrated that defense counsel was engaged in the process of attempting to further their client's interests, not failing to act as counsel." *Id.*

Fox must show that his attorneys' representation was deficient in order to prevail in his ineffective-assistance-of-counsel claim. *See Strickland*, 466 U.S. at 687. A review of the trial transcript admittedly reveals many instances where Fox's counsel was reprimanded by the trial court for their behavior in the courtroom. But the record also reveals that Fox received competent representation overall. His attorneys successfully delivered an opening statement and a closing

argument, cross-examined the state's witnesses, marshaled witnesses in support of Fox's account of the shooting, and were fully engaged in the trial proceedings. Fox's counsel, as the state appellate court observed, were both "experienced attorneys with a significant history of trying homicide cases." *Fox*, 2002 WL 378063 at \*10.

"To counteract the natural tendency to fault an unsuccessful defense, a court reviewing a claim of ineffective assistance must 'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *Nix v. Whiteside*, 475 U.S. 157, 165 (1986) (quoting *Strickland*, 466 U.S. at 689); *see also Burton v. Renico*, 391 F.3d 764, 774 (6th Cir. 2004) ("Strategic choices by counsel, while not necessarily those a federal judge in hindsight might make, do not rise to the level of a Sixth Amendment violation."). Because Fox has failed to point to any evidence that demonstrates that his counsel's courtroom conduct actually prejudiced his defense, he is unable to satisfy the *Strickland* test. We thus conclude that the determination of the state court that Fox received the effective assistance of counsel was not "unreasonable" within the meaning of AEDPA.

### 3. *Counsel's other alleged errors*

Fox points to several other instances of allegedly poor performance by his attorneys in support of his claim that he was denied the effective assistance of counsel. Among these instances are his counsel's failure to object to duplicative and unduly prejudicial photographs of the crime scene, to question Padovan regarding the inconsistent accounts of the shooting that Padovan gave to the police, and to present a coherent theory of the case to the jury. Fox also alleges that Dye undermined the credibility of Fox's testimony by speaking to him at a recess during his cross-

examination by the prosecutor. When questioning resumed after the recess, the prosecutor asked Fox if he had spoken with his attorney. Fox denied that he had. The state then called a courtroom deputy as a rebuttal witness, who testified to having seen Fox and Dye conversing. Fox contends that this impeachment was especially damaging because it was the last testimony offered before closing arguments were delivered to the jury.

A review of the record establishes that none of the alleged shortcomings of Fox's counsel were so severe as to have "undermine[d] confidence in the outcome" of his trial, the showing required in order to support a claim of ineffective assistance of counsel. *See Strickland*, 466 U.S. at 694. For instance, when the government introduced two photos of the crime scene, Fox's counsel objected. But the court overruled the objection, stating that all of the 74 photographs were admissible because "every photo here is relevant in some way." When the government moved to admit the remaining 72 photographs later in the trial, defense counsel did not renew any objection to the photographs. This is hardly the kind of error that is "so serious that counsel was scarcely functioning as counsel at all." *Burton*, 391 F.3d at 774; *see also Strickland*, 466 U.S. at 703 n.2 (citing cases where counsel was unconscious or asleep as examples of ineffective assistance). With respect to the other alleged errors of counsel, the state appellate court found that Fox had not been denied effective assistance because the evidence presented at trial was more than sufficient to support his murder conviction.

Although the trial strategy and courtroom conduct of his attorneys is not above criticism, none of the arguments advanced by Fox in support of his ineffective-assistance-of-counsel claim satisfy the two-part *Strickland* test. Some of the errors that Fox alleges might be a close call, but

we are unable to conclude that the state appellate court's decision is contrary to or an unreasonable application of clearly established federal law. *See Miskel v. Karnes*, 397 F.3d 446, 451 (6th Cir. 2005) (observing that "the standard of review established by AEDPA is determinative in this case") (footnote omitted).

**C.    The determination of the state court that Fox's Fifth Amendment rights were not violated is not contrary to or an unreasonable application of clearly established federal law**

Fox argues that the trial court should have declared a mistrial after Dye's inappropriate telephone conversation with Padovan was revealed to the jury. This claim fails, however, because Fox must show that his attorney's alleged bribery attempt prejudiced his case. *See United States v. Moore*, 917 F.2d 215, 220 (6th Cir. 1990) (permitting a defendant to move for a mistrial only "where there is a legitimate claim of seriously prejudicial error"). As discussed in Part II.B.1. above, Fox is unable to demonstrate that this incident affected the jury's verdict.

Moreover, the decision of whether to declare a mistrial is within the trial court's sound discretion. *See United States v. Macias*, 387 F.3d 509, 515 (6th Cir. 2004) ("We review a district court's denial of a motion for mistrial for an abuse of discretion."). We thus conclude that the determination of the state appellate court that Fox's Fifth Amendment rights were not violated is not contrary to or an unreasonable application of clearly established federal law.

### III. CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.